UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

RICKY KAMDEM-OUAFFO,

                         Plaintiff,

            -against-

BALCHEM CORPORATION; GIDEON
OENGA; BOB MINIGER; RENEE
McCOMB, THEODORE HARRIS; JOHN
KUEHNER; TRAVIS LARSEN; and
MICHAEL SESTRICK,

                      Defendants.

17-CV-2810 (KMK)

OPINION & ORDER

Appearances

Ricky Kamdem-Ouaffo
East Brunswick, NJ
*Pro Se Plaintiff*

Michael A. Frankel, Esq.
Jackson Lewis P.C.
White Plains, NY
*Counsel for Defendants*

KENNETH M. KARAS, United States District Judge:

        Plaintiff Ricky Kamdem-Ouaffo ("Plaintiff") brings this Action against Balchem

Corporation ("Balchem"); Gideon Oenga, Senior Manager of the Analytical Laboratory

("Oenga"); Bob Miniger, Vice President of Human Resources ("Miniger"); Renee McComb,

Senior Manager of Human Resources ("McComb"); Theodore Harris, CEO ("Harris"); John

Kuehner, Vice President of Research and Development and Operations ("Kuehner"); Travis

Larsen, legal counsel ("Larsen"); and Michael Sestrick, Chief Technology Officer ("Sestrick,"

and together with the other named individuals, "Individual Defendants," and collectively with

Balchem, "Defendants") alleging he was denied a promotion and pay increase and then

terminated from his employment at Balchem for objecting to the ban of his "[M]uslim hoodie attire" by Balchem and its executives and managers.  (*See* Am. Compl. ¶ 13 (Dkt. No. 24).)  Plaintiff raises twelve causes of action under Federal and New York state law: (1) religious discrimination in violation of Title VII of the Civil Rights Act of 1964, ("Title VII") (Am. Comp. ¶¶ 565–618); (2) retaliation in violation of Title VII, (*id.* ¶¶ 619–674); (3) wrongful termination, (*id.* ¶¶ 675–765); (4) breach of contract or breach of implied contract, (*id.* ¶¶ 766–856); (5) intentional infliction of emotional distress, (*id.* ¶¶ 857–952); (6) negligence, (*id.* ¶¶ 953–1282); (7) fraudulent concealment, (*id.* ¶¶ 1283–1381); (8) violation of the First Amendment freedom of religion, (*id.* ¶¶ 1382–1484); (9) breach of fiduciary duty, (*id.* ¶¶ 1485–1831); (10) libel, slander, and/or defamation, (*id.* ¶¶ 1832–2155); (11) breach of the implied covenant of good faith and fair dealing, (*id.* ¶¶ 2156–2246); and (12) unjust enrichment, (*id.* ¶¶ 2247–2337).  Before the Court is Defendants' Motion To Dismiss (the "Motion").  (Defs.' Notice of Motion (Dkt. No. 28).)  For the reasons that follow, the Motion is granted in part, and denied in part.

## I. Background

### A.  Facts

The following facts are drawn from the Amended Complaint and are taken as true for the purpose of resolving the instant Motion.  (Am. Compl.)

Plaintiff worked at Balchem from April 2015 until he was fired on August 22, 2016.  (*Id.* ¶¶ 26, 60.)[1]  Plaintiff alleges he "has Islam and Muslim religious practices[,] as well as practices from other religions."  (*Id.* ¶ 11.)  His practice included wearing a hooded sweatshirt "the

---

[1] The Amended Complaint frequently repeats each paragraph throughout.  (*See generally* Am. Compl.)  For ease, the Court cites to the paragraph number where each allegation is first made against each Defendant.

[M]uslim way," (*Id.* ¶ 453), which he describes as his "[M]uslim hoodie," or "Islam Muslim hoodie," (*id.* ¶¶ 13, 54).  Plaintiff alleges that once Balchem and its managers and executives "discovered that Plaintiff had [M]uslim religious [p]ractices, and that Plaintiff had no intention of abandoning his [M]uslim religious practices, Balchem then imposed on Plaintiff a so-called Performance Improvement Plan 'PIP' as a cover up to terminate Plaintiff's employment and to breach Plaintiff's employment contract."  (*Id.* ¶ 22.)  According to Plaintiff, in addition to being placed on the PIP, he was denied a promotion and a pay increase, and ultimately terminated "for having objected [t]o being subject to discrimination because of his Islam and Muslim religion practices."  (*Id.* ¶ 34.)

### 1.  Plaintiff's Hiring at Balchem and the Terms of His Employment

Balchem is a food and pharmaceutical company specializing in human and animal nutrition.  (*Id.* ¶ 25.)  Plaintiff was hired in April 2015 to do technology innovation work at Balchem's research and development facility in New Hampton, NY.  (*Id.* at ¶ 26.)  According to Plaintiff, at the time of his hiring, Balchem was looking for someone to develop new encapsulation technologies.  (*Id.* ¶ 27.)  In January 2015, Balchem's Chief Science Officer Dr. Bob Dull ("Dull") invited Plaintiff to a "brainstorming lunch," (*id.* ¶ 29), where Plaintiff learned of Balchem's needs and made various proposals and suggestions based on his experience with encapsulation technology, (*id.* ¶ 30).  After the lunch, Plaintiff followed up with Dull regarding other ideas he had for new encapsulates.  (*Id.* ¶¶ 386–387.)  Balchem then invited Plaintiff to interview for a position at the company in February 2015, and subsequently offered him a job. (*Id.* ¶¶ 31–33, 388.)

After receiving the offer, Plaintiff negotiated the terms of his employment with Dull, McComb, Miniger, and Oenga.  (*Id.* ¶ 37.)  Plaintiff asked for "more money, bonuses[,] and

promises for increases and growth." (*Id.* ¶ 397.) Plaintiff alleges his final employment contract included "written provisions that upon meeting 'key performance objectives,' Plaintiff was eligible for 'an increase' on [sic] 'salary.'" (*Id.* ¶¶ 14, 35; *see also* Am. Compl. Ex. VI ("Offer Letter") 93 (Dkt. No. 24) (providing that "[u]pon the completion of six months from your official hire date as you transition into your new role, your salary will be re-evaluated based on meeting key performance objectives as set forth by your manager, after which time you may be eligible for an increase on your base salary").)[2] Additionally, Plaintiff alleges Defendants agreed to "verbal provisions that should Plaintiff meet key performance objectives and that should Plaintiff develop patented technologies/processes or products, Plaintiff [could] be rewarded financially with [a] substantial amount of pay bonuses commensurate with the potential and value of the inventions and that the company will open a laboratory for Plaintiff where Plaintiff will be able to establish himself for the rest of his industry career." (Am. Compl. ¶¶ 15.) More specifically, Plaintiff alleges the bonus would be set "at about 25% of the profit potential of the technology and new products as [is] typically . . . the case in academia." (*Id.* ¶ 365.)

Plaintiff alleges that Miniger, McComb, Harris, Kuehner, Larsen, Sestrick, and Oenga were aware that Plaintiff had met and even exceeded the key performance objectives, "by developing a whole new class of encapsulates, something that no Balchem[] scientist was ever able to do." (*Id.* ¶¶ 111, 115, 138, 142, 167, 175, 178, 202, 211, 214, 237, 246, 249, 281, 284,

---

[2] Plaintiff's Amended Complaint includes various exhibits. (*See id.* at 73–98.) When citing to these, the Court refers to the ECF generated page number in the top right corner.

1065.)[3]  Accordingly, Plaintiff was entitled to a salary increase and the bonus.  (*Id.*)[4]

Nonetheless, Plaintiff alleges that Defendants breached the employment agreement by refusing

to provide him the pay increase as stipulated in the written and verbal contracts after he "met and

exceeded the key performance objectives."  (*Id.* ¶ 18.)  Plaintiff alleges that this was because

"Balchem . . . and its executive and managers despised the fact that Plaintiff was a [M]uslim and

had [M]uslim religious practices," (*id.* ¶ 363), and Balchem "did not want the world to know that

a [M]uslim invented and created the technology," (*id.* ¶ 370).

### 2.  Plaintiff's Altercation with Oenga

"Plaintiff alleges that around the month of May of 2016, as the beginning of the month

Ramadan approached, Plaintiff wore a hoodie to the laboratory where he worked."  (*Id.* ¶ 300.)

Oenga was the Senior Manager of the Analytical Laboratory Plaintiff worked in at Balchem, and

Plaintiff reported to Oenga and regularly communicated his scientific reports to him.  (*Id.* ¶¶ 46,

51.)[5]  Sometime between May 10–13, 2016, Oenga called Plaintiff into his office and "told

Plaintiff that Plaintiff must no longer wear a hoodie that he was wearing because it was [M]uslim

and that Balchem employees had been coming to [Oenga] asking him about [Plaintiff's] religion

---

[3] Plaintiff cites to the papers filed in support of Defendants' Motion for a Protective Order pursuant to Rule 26(c) of the Federal Rules of Civil Procedure as "confirm[ing]" Plaintiff's allegation that he had achieved work that no Balchem[] scientist ha[d] been able to achieve," and had thus satisfied the "key performance objectives" in the employment contract. (*See id.* ¶¶ 359–360 (citing Aff'n of Michael A. Frankel, Esq. in Supp. of Mot. For Protective Order (Dkt. No. 11)).)

[4] Plaintiff "personally valued the technology and products thereof to several billions of dollars."  (*Id.* ¶ 369.)

[5] According to Plaintiff, Oenga lived in Kenya prior to moving to the United States, and, during his time in Kenya, Oenga "was known to talk bad about Muslims and Islam, and derided them."  (*Id.* ¶¶ 47, 49.)

and did not want to see [Plaintiff] wearing [a] [M]uslim hoodie." (*Id.* ¶ 52; *see also id.* ¶ 301 (alleging Oenga told Plaintiff to "stop wearing his [M]uslim hoodie to work because nobody at Balchem liked to see it"); Compl. Ex. B ("Aug. 17, 2016 Pl. Letter") 32 (Dkt. No. 1) (Oenga "told [Plaintiff] that people in the Company have been . . . asking about [his] Muslim hoodie attire and about when and why [he] converted to Islam . . . He told [Plaintiff] that such a Muslim hoodie attire was not tolerated at Balchem Corporation and that accordingly he was ordering [him] to stop bringing and wearing" it.); *see also* Am. Compl. ¶ 301 (alleging Oenga told Plaintiff to "stop wearing his [M]uslim hoodie to work because nobody at Balchem liked to see it").)[6] Plaintiff requested he be allowed to continue to wear his Muslim hoodie, "especially since Ramadan was approaching." (*Id.* ¶ 53.)

Then, on May 26, 2016, during a "regular one-on-one biweekly meeting," (Aug. 17, 2018 Pl. Letter 32), Oenga told Plaintiff he "was insubordinate because he had continued to wear his Islam Muslim hoodie to work," (*id.* ¶ 54). Oenga repeatedly shouted and called Plaintiff a "[h]ell employee." (Aug. 17, 2016 Pl. Letter 32 (emphasis omitted)). Plaintiff told Oenga "that he was going to report to Human Resources about it." (*Id.* ¶ 55.) "Oenga then elevated his voice, stood up to open his office door[,] and asked Plaintiff to take his belongings and go to HR never to return again." (*Id.* ¶ 56.) Oenga "appeared to want to physically lay his hands on [Plaintiff] to force [him] out of his [o]ffice." (Aug. 17, 2018 Pl. Letter 32.) Plaintiff alleges he was "savagely harassed" during the meeting. (*Id.* ¶ 302.) After the incident, "Plaintiff felt sick"

---

[6] Plaintiff submitted exhibits to his initial Complaint, but did not attach all of them to the Amended Complaint. (*See* Compl.) Because Plaintiff is pro se and is clearly relying on these exhibits to support his claims, the Court will consider them. *See Blakely v. Lew*, No. 13-CV-2140, 2013 WL 6847102, at *1 n.1 (S.D.N.Y. Dec. 30, 2013) (considering exhibits attached only to the original complaint because "it is clear that [the] [p]laintiffs intended to attach [them] to the [a]mended [c]omplaint"), *aff'd*, 607 F. App'x 15 (2d Cir. 2015).

and went to his physician, and "was diagnosed with distress reaction to the incidents."  (*Id.* ¶ 58.)
Plaintiff alleges his physician wrote Balchem that "there was an unwarranted amount of bias on
the part of his [s]upervisor that triggered the [s]tress." (Aug. 17, 2016 Pl. Letter 38.)  Plaintiff
stayed home sick for a week.  (*Id.* ¶ 59.)

### 3.  Plaintiff Reports to Human Resources

Around May 27, 2016, Plaintiff reported both Oenga's ban of his hoodie and the incident
in Oenga's office to McComb and Dull both verbally and by e-mail.  (*Id.* ¶¶ 57, 130; Compl. Ex.
A ("Aug. 24, 2016 Pl. Letter") 9 (Dkt. No. 1).)  Plaintiff contends his complaint and grievances
about employment discrimination were subsequently reported to Harris, Kuehner, Larsen, and
Sestrick by the "Human Resource Managers," and that there were several meetings with the
Human Resources Mangers and with the "R&D managers" about Plaintiff's complaint of
discrimination.  (*Id.* ¶¶ 157–58, 192–93, 228–29, 263–64.)[7]  However, neither McComb, Harris,
Kuehner, Larsen, nor Sestrick ordered or "conduct[ed] any meaningful investigation of the
incidents, rather [they] tried to find information and to devise [a] cover up."  (*Id.* ¶¶ 131, 159,
194, 230, 265.)  Around August 1, 2016, Plaintiff told McComb he was filing an employment
discrimination claim with the Equal Employment Opportunity Commission ("EEOC"), (*id.*
¶ 132), and Harris, Kuehner, Larsen, and Sestrick were allegedly informed of Plaintiff's EEOC
claim being filed by the Human Resources Department.  (*Id.* ¶¶ 160, 195, 231, 266.)

While Plaintiff was out sick following the altercation with Oenga, Balchem's Human
Resources Department informed Plaintiff that "Harris had ordered that Plaintiff must send them
the keys to his desk so that Plaintiff[']s desk [could] be searched."  (*Id.* ¶ 436.)  When he

_____

[7] Plaintiff does not indicate who the "Human Resource Managers" or "R&D managers"
are.  The Court presumes McComb and Miniger would, at a minimum, be considered Human
Resource Managers.

returned to work, Miniger "asked Plaintiff to turn over the keys of his desk to him and to return home and wait to see if Plaintiff would be allowed to return to work." (*Id.* ¶ 437.) Accordingly, Plaintiff turned over the keys and went home. (*Id.* ¶ 438.) Plaintiff was called back to work, (*id.* ¶ 439), and "found that his desk had been disorganized, had been searched and items including his [M]uslim religious articles had been moved around and flipped over in an intimidating manner," (*id.* ¶ 440). For example, the pages of Plaintiff's calendar with the Ramadan timeline "were flipped and disorderly and moved over." (*Id.* ¶ 441.) When asked, Oenga told Plaintiff that "Harris had ordered them to do that" and to specifically search "for Plaintiff[']s [M]uslim religious practices and documents." (*Id.* ¶ 442.) Oenga further "informed Plaintiff that things from [his] desk were brought to . . . Harris," who "did not like that Plaintiff had [M]uslim religious practices and evidence at his desk." (*Id.* ¶ 443.)

After Plaintiff started objecting to the ban of his Muslim hoodie, Oenga falsely reported to Human Resources that Plaintiff had not been able to do the innovation work he was hired to do. (*Id.* ¶ 64.) Plaintiff contends he in fact "had invented a new encapsulation technology . . . that no other scientist who had worked for Balchem had been able to do," (*id.* ¶ 65), and this was widely known within Balchem, (*id.* ¶ 76). However, Oenga started falsely claiming at "meetings with senior managers that he was the one who brought the one [sic] technology and products thereof." (*Id.* ¶ 77.)[8]

---

[8] Around May 26, 2016, (Aug. 17, 2016 Pl. Letter 35–36), "[p]ursuant to the terms of the employment offer contract, Plaintiff applied for [a] merit based promotion and/or salary increase, but Plaintiff was denied, although in the meantime other people who ha[d] done no significant achievements were getting promotions and new offices," (Am. Compl. ¶ 316). "Plaintiff was told that Balchem Corporation and its mangers/executives had opposed [the promotion] because Plaintiff had not recanted his [M]uslim practices and had continued to raise[] objection[s] over the ban of his [M]uslim attire." (*Id.* ¶ 449.) Plaintiff also alleges his promotion was denied because Balchem required 15 years of experience before such a promotion. (Aug. 17, 2016 Pl. Letter 36.)

During this time, Balchem was in the process of building a "new GMP laboratory," and "several analytical instruments were relocated from the old [a]nalytical laboratory to the new GMPs laboratory to make space for [p]roduct [d]evelopment and [i]nnovation." (*Id.* ¶¶ 411, 420.)[9] However, also as a result of Plaintiff reporting the hoodie ban, "the R&D Managers/supervisors stopped communicating to Plaintiff on the next steps for the space that was opened for Product Development work." (*Id.* ¶ 421.) Further, "Plaintiff was no longer informed of next steps for the use of the space that was vacated to make room for the Product Development and innovation." (*Id.* ¶ 422.) Plaintiff no longer received responses or support for his project. (*Id.* ¶ 428.)

#### 4.  Plaintiff's Placement on a Performance Improvement Plan

Upon returning to work on June 7, 2016, Plaintiff was required to sign the PIP, which mandated he "stop wearing his [M]uslim hoodie to work or else Plaintiff [would] not be allowed to return to work and [would] be terminated immediately." (*Id.* ¶¶ 105, 305; Aug. 24, 2016 Pl. Letter 9.) Plaintiff alleges the PIP was "retaliatory for Plaintiff[] having objected to the ban of his [M]uslim attire." (Am. Compl. ¶ 483.) According to Plaintiff, once Defendants "discovered that Plaintiff had [M]uslim religious [p]ractices, and that Plaintiff had no intention of abandoning his [M]uslim religious practices, [they] then advocated and/or supported imposing on Plaintiff a so-called [PIP] as a cover up to terminate Plaintiff's employment and to breach Plaintiff's employment contract." (*Id.* ¶¶ 22, 96, 121, 148, 184, 220, 225, 255, 290.) Plaintiff also suggests McComb, Harris, Kuehner, Larsen, and Sestrick imposed the PIP because Plaintiff had reported both Oenga's order that Plaintiff stop wearing his "Islam Muslim hoodie" and the incident with Oenga in his office. (*Id.* ¶¶ 133, 161, 196, 232, 267.) Miniger, McComb, Harris, Kuehner,

---

[9] Plaintiff does not allege what a "GMP laboratory" is.

Larsen, and Sestrick "approv[ed] that Plaintiff be subject to a [PIP]," (*id.* ¶¶ 105, 133, 170, 196,

232, 267), and, along with Oenga, authored the PIP, which mandated that "Plaintiff[']s [M]uslim

attire be banned from Balchem's premises," (*id.* ¶¶ 97, 122, 149, 185, 221, 256, 291).  Plaintiff

contends that Harris in particular approved of the PIP "because Plaintiff's [M]uslim attire . . .

was offensive to Balchem Corporation and to . . . Harris who had even sent people to search

Plaintiff's desk."  (*Id.* ¶ 447.)

      Plaintiff objected to the PIP, because it "contained several factually false statements

against Plaintiff and also mandated the ban of Plaintiff's [M]uslim hoodie allegedly because they

perceived Plaintiff's [M]uslim's hoodie and the manner of wearing the hoodie as

unprofessional."  (*Id.* ¶ 306.)  Plaintiff informed Balchem "that he was wearing his hoodie in

accordance with a [M]uslim tradition/manner and offered to wear his Muslim hoodie only at his

desk," but Plaintiff's compromise was denied.  (*Id.* ¶ 485.)  Plaintiff did, however, consent to

signing the portions of the PIP that contained requirements that reflected Balchem's standard

code of conduct.  (*Id.* ¶ 307.)  Miniger highlighted those sections, Plaintiff and Oenga initialed

them, and Miniger signed at the bottom.  (*Id.* ¶¶ 308–09.)

### 5.  Plaintiff's Photo Documentation of Discrimination

      Plaintiff alleges he complied with the PIP, but informed the Human Resources Manager

that he was "very concerned for being singled out for [the] PIP while he had brought new

technolog[y] [p]latforms for the companies in a relatively short time."  (*Id.* ¶ 313.)  Around

August 17, 2016, "Plaintiff decided to formally document the fact that since the ban of his

hoodie by [Balchem], other co-workers had all along [been] bringing . . . to work and wearing

hoodies in the laboratory and workplace."  (*Id.* ¶ 317, *see also* ¶ 60.)  Accordingly, Plaintiff

"took a couple of pictures of the hoodies" and emailed them to McComb on August 18, 2016

with commentary that despite the fact that other coworkers were bringing hoodies to work, his was banned.  (*Id.* ¶ 318; Aug. 24, 2016 Pl. Letter 8.)  Later that day, Plaintiff received an e-mail from Miniger accusing Plaintiff of having violated company policies and divulging proprietary information and asking that he delete the pictures.  (Aug. 4, 2016 Pl. Letter 8.)  The next day, "Plaintiff was then summoned at the HR Office and was accused of having stolen [Balchem's] trade secrets and for having violated [Balchem's] recording policy."  (Am. Compl. ¶ 324.)  During the meeting with Human Resources, Miniger and McComb informed Plaintiff that they had decided to suspend Plaintiff.  (*Id.* ¶¶ 106, 134.)[10]  Miniger and McComb told Plaintiff that he was being suspended in order to do "due diligence" and investigate "whether Plaintiff might have taken more pictures showing evidence Balchem committed employment discrimination." (*Id.* ¶¶ 107, 135.)  "Plaintiff asserted he had taken the pictures to show evidence to [Human Resources] that he was singled out for the hoodie ban while others were allowed to bring their[] [hoodies] to work and that he continued to object to the fact that his hoodie has been banned on the basis of creed and religion."  (*Id.* ¶ 326.)  Miniger, Harris, Kuehner, Larson, and Sestrick planned to have Plaintiff's laptop searched so "that any such evidence found on [P]laintiff's laptop [could] be destroyed."  (*Id.* ¶¶ 108, 164, 199, 243, 270.)

At some point, Oenga then, allegedly falsely, told Human Resources "that Plaintiff had taken pictures and videos of Balchem's trade secrets and had publicized them to outside entities."  (*Id.* ¶¶ 60–61.)  Oenga also falsely told Human Resources that Plaintiff took pictures of a cabinet containing trade secret material and had divulged the pictures to outside sources.

---

[10] Plaintiff alleges Harris, Kuehner, Larson, and Sestrick also either made the decision or supported the decision to suspend Plaintiff.  (Am. Compl. ¶¶ 162, 171–172, 197–198, 233–234, 268–269.)

(*Id.* ¶¶ 62–63.)[11]  Oenga, Miniger, McComb, Kuehner, Larson then "lied to the CEO . . . that Plaintiff had been taking pictures and shooting videos of [Balchem's] premises and facilities and publicizing them."  (*Id.* ¶¶ 93, 123, 150, 222, 257.)[12]

Miniger and McComb made the decision to terminate Plaintiff's employment.  (*Id.* ¶ 109, 136.)[13]  They subsequently called Plaintiff on August 22, 2016 to inform Plaintiff his employment was terminated.  (*Id.* ¶ 110.)

Plaintiff then communicated to Balchem that he wanted a review of his termination by Harris and the Board of Directors.  (*Id.* ¶ 450.)  Larsen called Plaintiff and told him he would inform Harris that Plaintiff "was appealing to the CEO Ted Harris to review the decision to terminate Plaintiff's employment."  (*Id.* ¶ 451.)  However, Larsen was "skeptical" about the reinstatement "because he knew how Balchem people felt about [the] [M]uslim religion and [M]uslim's [sic] practices and that therefore he was not optimistic of the outcome."  (*Id.* ¶ 452.)  Later, Larsen told Plaintiff that "Harris had approved of the [M]uslim ban and of Plaintiff's

---

[11] Plaintiff alleges he used the cabinet "to store small quantities of newly developed prototypes for shelf life observation over time to monitor the physical change of encapsulated materials," and such observation "usually includes documenting the appearance of the material by taking pictures/videos."  (*Id.* ¶ 72.)  Thus, "[o]ften times, even at the request of . . . Oenga, Plaintiff had taken pictures and videos of his experimental set up and product prototypes and had communicated those pictures and videos to . . . Oenga."  (*Id.* ¶¶ 74–75.)  Additionally, "the laboratory did not have any video recording capability and the R&D Managers therefore approved that Plaintiff could use his smart phone to shoot pictures and videos in the laboratory."  (*Id.* ¶ 419.)

[12] Plaintiff also alleges that Harris "lied" regarding whether Plaintiff had taken pictures and videos of company premises and facilities and published them.  (*Id.* ¶¶ 123, 150.)  However, it is unclear who Harris lied to, as everyone else allegedly lied to Harris.  (*Id.* ¶¶ 123, 150, 222, 257.)

[13] Again, Plaintiff alleges that Harris, Kuehner, Larson, and Sestrick either made the decision, or supported the decision, to terminate Plaintiff's employment.  (*Id.* ¶ 165–166, 200, 235, 271.)

termination for taking pictures of other employees hoodies and submitting the pictures to [human resources] to substantiate Plaintiff's objection to the ban of his [M]uslim attire although Plaintiff's [M]uslim attire was also a hoodie design just as that of other employees, but Plaintiff wore his hoodie the [M]uslim way."  (*Id.* ¶ 453.)  Plaintiff appealed for review of his termination "[o]n several occasions" and asked for reinstatement, but Balchem's position did not change. (*Id.* ¶ 454.)  Plaintiff was informed "again and again" that "Harris had approved of the discriminatory and wrongful termination of Plaintiff."  (*Id.* ¶ 455.)

### 6.  Proceedings Before the New York State Division of Human Rights and EEOC

On August 1, 2016, Plaintiff filed a discrimination and retaliation complaint with the EEOC.  (*Id.* ¶ 328.)  On August 17, 2016, Plaintiff "transferred" his complaint to the New York State Division of Human Rights ("Division of Human Rights").  (*Id.* ¶ 329.)  The complaint was docketed on August 19, 2016.  (*Id.* ¶ 330.)[14]

The Division of Human Rights then started an investigation of the allegations.  (*Id.* ¶ 333.)  On October 11, 2016, Balchem filed a written response and requested that Plaintiff's discrimination charge be dismissed.  (*Id.* ¶ 334; Am. Compl. Ex. A ("Balchem Division of Human Rights Letter") 78.)  Plaintiff then "provided the Division of Human Rights with information on specific evidence in the possession of Balchem Corporation with request that the Division of Human Rights should obtain the said [sic] evidence from Balchem Corporation and account for it in its investigation and findings."  (*Id.* ¶ 335.)  The Division of Human Rights then requested the evidence from Balchem, (*id.* ¶ 336), however, it "refused to produce the discovery sought," (*id.* ¶ 337).  The requested information included Plaintiff's performance evaluation for

---

[14] Plaintiff notes that the day the complaint was docketed with the Division of Human Rights was the same day that Plaintiff was suspended.  (*Id.* ¶ 331.)

the 2015–16 year, (*id.* ¶ 338), which "would have shown that Plaintiff['s] performance at least met key performance expectations," (*id.* ¶ 339), and "e-mails in which Plaintiff expressed grievance[s] over the ban of his [M]uslim hoodie, (*id.* ¶ 340). "The Division of Human Rights then sent [n]otices that if Balchem Corporation did not produce the discovery sought, then Plaintiff may be entitled to seek remedy in Federal Court, but Balchem Corporation still did not produce the discovery." (*Id.* ¶ 341.)[15]  Plaintiff then applied for an Order of Administrative Dismissal for Convenience to allow Plaintiff to proceed to Federal court, (*id.* ¶ 342), which the Division of Human Rights granted, (*id.* ¶ 343).[16]  Balchem did not appeal the Order of Administrative Dismissal. (*Id.* ¶ 344.) "Plaintiff then sought the Notice of Rights to [S]ue from the EEOC," and on January 20, 2017, "EEOC upheld the Division of Human Rights Decision/Order and accordingly issued [the] Notice [o]f Rights [t]o Sue." (*Id.* ¶ 345.)[17]

Additionally, Plaintiff alleges that Balchem's managers and executives libeled and defamed Plaintiff to the New York Division of Human Rights and the EEOC. (*Id.* ¶ 18–19.) According to Plaintiff, the Individual Defendants "came together to agree on the libel and the defamation statements to write against Plaintiff" to the Division of Human Rights. (*Id.* ¶¶ 92–

---

[15] These "notices" appear to be emails between Plaintiff and the Division of Human Rights investigator regarding whether Plaintiff was seeking Federal relief and should proceed to Federal court. (Pl.'s Aff. Ex. 56, at 36–37 (Dkt. No 32).)

[16] The Division of Human Rights Dismissal for Administrative Convenience states that a "hearing would be undesirable" and the complaint was "dismissed on the grounds of administrative convenience" because "[t]he complainant intends to pursue federal remedies in court, in which forum all the issues concerning the question of discrimination charged can be resolved. (Compl. Ex. 4, at 54.)

[17] The EEOC Dismissal and Notice of Rights states the EEOC is closing its file because the "Charging Party Wishes to Pursue Matter in Federal District Court." (*Id.* at 63.)

93, 117, 144, 180, 216, 251, 286.)  In response to Plaintiff's complaint before the Division of

Human Rights, Defendants wrote:

> Balchem Corporation terminated [Plaintiff's] employment because of continued and
> ongoing performance failures, failure to comply with the terms of his [PIP], his violation
> of Balchem's policy against photographing sensitive laboratory information, and
> misleading Balchem about recordings he took of Balchem's research and development
> laboratory (the "R&D Lab").

(*Id.* ¶ 478; Balchem Division of Human Rights Letter 78.)  Plaintiff alleges Defendants defamed

him because the statement regarding Plaintiff's "continued and ongoing performance failures"

was false, (*id.* ¶ 18), and Balchem "falsely accus[ed] Plaintiff of having taken pictures and

publicizing sensitive laboratory information," (*id.* ¶ 41).  Plaintiff avers Defendants "also libeled

and defamed Plaintiff's moral character and work ethics."  (*Id.* ¶¶ 19, 93, 118, 145, 181, 217,

252, 287.)  "Plaintiff's professional and moral reputation was severely damaged by the libel,

slander[,] and defamation that [Defendants] wrote and publish[ed] to the Director of Human

Rights Division."  (*Id.* ¶ 615.)

    As additional factual support for his defamation allegations, Plaintiff alleges that when

the Division of Human Rights asked Defendants to provide evidence of their accusations

regarding Plaintiff's video recording, "they failed to provide evidence that Plaintiff had done any

such thing of which they falsely accused Plaintiff."  (*Id.* ¶ 99.)  And, "when the EEOC requested

that Balchem Corporation produce documents to support Balchem Corporation's claims that

Plaintiff was terminated for '*ongoing performance failures*,' Balchem Corporation declined to do

so because Balchem [C]orporation and its managers knew they were lying."  (*Id.* ¶ 472.)

Further, Plaintiff also points to alleged inconsistencies between Balchem's filings with the

EEOC and the documents filed before the Court.  According to Plaintiff, Defendants' arguments

made in support of the Protective Order prove Defendants' statements regarding his performance

failures are "factually false" and "intentionally malicious, libelous[,] and defamatory," because Plaintiff in fact had many performance achievements.  (*Id.* ¶¶ 479–80, 535.)

### 7.  Consequences of Plaintiff's Termination

Since his termination, Plaintiff "has been unemployed and has lost wages and benefits." (*Id.* ¶ 348.)  Plaintiff was "offered no severance," (*id.* ¶ 541); "had [a] vacation balance and it was not paid for," (*id.* ¶ 542); his "health insurance and other benefits were also terminated immediately with his employment," (*id.* ¶ 543); and he "has [at] no time been paid the 25% bonus on the market potential and value of the" technology and products he developed at Balchem, (*id.* ¶ 544), nor was he given a laboratory "to continue developing technologies in his field of expertise," (*id.* ¶ 617).  Additionally, "Plaintiff has suffered mental and emotional sickness and has had to use drugs and therapy to cope with the sickness."  (*Id.* ¶ 613.)

Plaintiff looked for employment after his termination, however "the major hurdle that Plaintiff has faced has been that his tenure at Balchem was short, therefore casting doubt in [the] minds of potential employers as to whether Plaintiff is capable of achieving anything."  (*Id.* ¶ 458.)  Plaintiff asked Balchem several times to "issue a statement attesting of his accomplishments during the time he worked at Balchem," (*id.* ¶ 459), to show potential employers "when concerns arise about the duration of Plaintiff's tenure," (*id.* ¶ 372), but someone told Plaintiff that Balchem and Harris "will not approve the issuance of any such statement of course because of [Plaintiff's] [M]uslim religious practices."  (*Id.* ¶ 460.)  Plaintiff contends "that it is very well documented . . . that Plaintiff single handedly brought a new encapsulation process/technology to Balchem" and Balchem "has retained patent attorneys to pursue at least three patents because no competitor has the technology."  (*Id.* ¶ 461.)  Plaintiff again points to the papers Defendants filed in support of the Protective Order as evidence that

Balchem "placed a high trade secret value on the work that Plaintiff accomplished." (*Id.* ¶¶ 462–470.)[18]

Plaintiff has since re-applied for work at Balchem and "Balchem has not even called Plaintiff for [an] interview and has opposed the rehiring of Plaintiff." (*Id.* ¶ 44.) Plaintiff also applied for other science jobs that Balchem posted on its website "for expertise that Plaintiff has," but "Plaintiff was not even called for [an] interview." (*Id.* ¶ 45.)

Plaintiff now seeks, "[b]ack pay;" "[f]ront pay;" "[c]ompensatory damages;" "[p]unitive [d]amages;" "[i]njunctive relief comprising of [an] injunction with respect to any future unlawful discrimination;" "[m]ake-whole relief comprising of retroactive seniority, tenure, restoration of benefits, salary adjustment, expunging adverse material from personnel files, costs of suit, attorney fees, letters of commendation;" "[m]onetary [d]amages in [the] amount equal to 25% of the market and [b]usiness value of the HBDS Technologies and Products thereof pursuant to the pre-employ[]ment verbal and written contracts and agreements;" $10,000,000 in damages against Harris; $7,500,000 in damages against Miniger, Kuehner, and Sestrick; and $5,000,000 in damages each against Oenga, McComb, and Larsen. (*Id.* ¶ 2338.)[19]

B.  Procedural History

Plaintiff filed the initial Complaint on April 14, 2017. (Compl.) On August 8, 2017, Defendants answered the Complaint. (Dkt. No. 14.) On June 14, 2017, Defendants filed a Motion for a Protective Order pursuant to Rule 26(c) of the Federal Rules of Civil Procedure to

---

[18] Plaintiff alleges that "the Federal Court granted . . . trade secret and patentability status on Plaintiff's work at Balchem," citing to the Order granting Defendants' request for a protective order. (Am. Compl. ¶ 463 (citing Protective Order (Dkt. No. 20).) The Court did no such thing. (*See* Protective Order.)

[19] Plaintiff named the technology he developed "HBDS." (Am. Compl. ¶ 315.)

prevent Plaintiff from filing a confidential, proprietary document with the Court, along with a supporting affirmation and affidavit.  (Dkt. Nos. 10–11.)  The Motion for a Protective Order was unopposed by Plaintiff, and the Court granted it.  (Dkt. No. 20.)

On August 25, 2017, Plaintiff requested an extension of time to file an Amended Complaint.  (Dkt. No. 21.)  Defendants opposed the request.  (Dkt. No. 22.)  The Court nonetheless granted Plaintiff's request.  (Dkt. No. 23.)  On September 19, 2017, Plaintiff filed the Amended Complaint.  (Am. Compl.)

On October 16, 2017, the Court set a schedule for Defendants to file the instant Motion. Pursuant to the schedule, on November 17, 2017 Defendants filed the instant Motion.  (Defs.' Notice of Motion; Defs.' Mem. of Law in Support of Motion To Dismiss ("Defs.' Mem.") (Dkt. No. 29); Aff'n of Michael A. Frankel ("Frankel Aff'n") (Dkt. No. 30).)  On December 19, 2017, Plaintiff filed his opposition papers.  (Pl.'s Mem. of Law in Opp. To Motion To Dismiss ("Pl.'s Mem.") (Dkt. No. 31); Aff. of Ricky Kamdem-Ouaffo ("Kamdem-Ouaffo Aff.") (Dkt. No. 32).) On January 9, 2018, Defendants filed their Reply.  (Defs.' Reply Mem. of Law in Support of Motion To Dismiss ("Defs.' Reply") (Dkt. No. 33); Reply Aff'n of Michael A. Frankel, Esq. ("Frankel Reply Aff'n") (Dkt. No. 34).)  On January 17, 2018, Plaintiff filed a letter requesting the Motion be treated as a Motion for Summary Judgment.  (Dkt. No. 35.)[20]

## II.  Discussion

### A.  Standard of Review

"While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his [or her] entitlement to

---

[20] The Court denies this request.  The claims not dismissed as a matter of law in the instant Opinion involve factual disputes that require discovery to resolve.

relief requires more than labels and conclusions, and a formulaic recitation of the elements of a

cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citations,

alteration, and internal quotation marks omitted).  Indeed, Rule 8 of the Federal Rules of Civil

Procedure "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation."

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  "Nor does a complaint suffice if it tenders naked

assertions devoid of further factual enhancement."  *Id.* (alteration and internal quotation marks

omitted).  Instead, a complaint's "[f]actual allegations must be enough to raise a right to relief

above the speculative level."  *Twombly*, 550 U.S. at 555.  Although "once a claim has been stated

adequately, it may be supported by showing any set of facts consistent with the allegations in the

complaint," *id.* at 563, and a plaintiff must allege "only enough facts to state a claim to relief that

is plausible on its face," *id.* at 570, if a plaintiff has not "nudged [his or her] claim[] across the

line from conceivable to plausible, the[] complaint must be dismissed," *id.*; *see also Iqbal*, 556

U.S. at 679 ("Determining whether a complaint states a plausible claim for relief will . . . be a

context-specific task that requires the reviewing court to draw on its judicial experience and

common sense.  But where the well-pleaded facts do not permit the court to infer more than the

mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the

pleader is entitled to relief.'" (citation omitted) (second alteration in original) (quoting Fed. R.

Civ. P. 8(a)(2))); *id.* at 678–79 ("Rule 8 marks a notable and generous departure from the

hypertechnical, code-pleading regime of a prior era, but it does not unlock the doors of discovery

for a plaintiff armed with nothing more than conclusions.").

　　　 "[W]hen ruling on a defendant's motion to dismiss, a judge must accept as true all of the

factual allegations contained in the complaint."  *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per

curiam); *see also Nielsen v. Rabin*, 746 F.3d 58, 62 (2d Cir. 2014) ("In addressing the sufficiency

of a complaint we accept as true all factual allegations. . . . " (internal quotation marks omitted));

*Aegis Ins. Servs., Inc. v. 7 World Trade Co.*, 737 F.3d 166, 176 (2d Cir. 2013) ("In reviewing a

dismissal pursuant to Rule 12(b)(6), we . . . accept all factual allegations in the complaint as

true . . . ." (alteration and internal quotation marks omitted)).  Further, "[f]or the purpose of

resolving [a] motion to dismiss, the Court . . . draw[s] all reasonable inferences in favor of the

plaintiff."  *Daniel v. T & M Prot. Res., Inc.*, 992 F. Supp. 2d 302, 304 n.1 (S.D.N.Y. 2014)

(citing *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012)).

      Where, as here, a plaintiff proceeds pro se, the Court must "construe[] [his complaint]

liberally and interpret[] [it] to raise the strongest arguments that [it] suggest[s]."  *Sykes v. Bank of*

*Am.*, 723 F.3d 399, 403 (2d Cir. 2013) (per curiam) (internal quotation marks omitted); *see also*

*Farzan v. Wells Fargo Bank, N.A.*, No. 12-CV-1217, 2013 WL 6231615, at *12 (S.D.N.Y. Dec.

2, 2013) (same), *aff'd sub nom.* 619 F. App'x 15 (2d Cir. 2015).  However, "the liberal treatment

afforded to pro se litigants does not exempt a pro se party from compliance with relevant rules of

procedural and substantive law."  *Bell v. Jendell*, 980 F. Supp. 2d 555, 559 (S.D.N.Y. 2013)

(internal quotation marks omitted); *see also Caidor v. Onondaga County*, 517 F.3d 601, 605 (2d

Cir. 2008) ("[P]ro se litigants generally are required to inform themselves regarding procedural

rules and to comply with them." (italics and internal quotation marks omitted)).

      Generally, "[i]n adjudicating a Rule 12(b)(6) motion, a district court must confine its

consideration to facts stated on the face of the complaint, in documents appended to the

complaint or incorporated in the complaint by reference, and to matters of which judicial notice

may be taken."  *Leonard F. v. Isr. Disc. Bank of N.Y.*, 199 F.3d 99, 107 (2d Cir. 1999) (internal

quotation marks omitted).  However, when the complaint is pro se, the Court may consider

"materials outside the complaint to the extent that they are consistent with the allegations in the

complaint," *Alsaifullah v. Furco*, No. 12-CV-2907, 2013 WL 3972514, at *4 n.3 (S.D.N.Y. Aug. 2, 2013) (internal quotation marks omitted), including, "documents that a pro se litigant attaches to his opposition papers," *Agu v. Rhea*, No. 09-CV-4732, 2010 WL 5186839, at *4 n.6 (E.D.N.Y. Dec. 15, 2010) (italics omitted), statements by the plaintiff "submitted in response to [a] defendant's request for a pre-motion conference," *Jones v. Fed. Bureau of Prisons*, No. 11-CV-4733, 2013 WL 5300721, at *2 (E.D.N.Y. Sept. 19, 2013), and "documents that the plaintiff[] either possessed or knew about and upon which [he or she] relied in bringing the suit," *Rothman v. Gregor*, 220 F.3d 81, 88 (2d Cir. 2000).

   B.  Analysis

   Defendants raise twelve grounds for dismissing the Amended Complaint.  The Court addresses each in turn.

   1.  Rule 8 of the Federal Rules of Civil Procedure

   Defendants argue Plaintiff's Amended Complaint should be dismissed for violating the pleading requirements of Rule 8 of the Federal Rules of Civil Procedure.  (Defs.' Mem. Law 5–6.)  Rule 8 requires a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  Further, "[e]ach allegation must be simple, concise, and direct."  Fed. R. Civ. P. 8(d)(1).  Other courts have held that "[c]omplaints that are rambling, repetitious, and unnecessarily voluminous fail to meet the minimum requirements of Rule 8(a), because unnecessary prolixity in pleading places an unjustified burden on the court and on the party who must respond to it because they are forced to select the relevant material from a mass of verbiage."  *Benzo v. New York State Div. of Human Rights*, No. 95-CV-5362, 1997 WL 37961, at *3 (S.D.N.Y. Jan. 31, 1997), *aff'd*, 141 F.3d 1151 (2d Cir. 1998) (alterations and internal quotation marks omitted).  Nevertheless, while "the [C]ourt has

the power, on its own initiative or in response to a motion by the defendant . . . to dismiss the

complaint, . . . [d]ismissal . . . is usually reserved for those cases in which the complaint is so

confused, ambiguous, vague, or otherwise unintelligible that its true substance, if any, is well

disguised." *Salahuddin v. Cuomo*, 861 F.2d 40, 42 (2d Cir. 1988).

      Plaintiff's Amended Complaint certainly toes the line:  Plaintiff's Amended Complaint is

392 pages long and contains 2,338 numbered paragraphs, many with further sub-numbering.

Numerous paragraphs are repeated over a dozen times.  For example, Plaintiff's allegation that

"Plaintiff[']s employment contract with Balchem Corporation made written provisions that upon

meeting 'key performance objectives,' Plaintiff was eligible for 'an increase' on 'salary'"

appears in the Amended Complaint 57 times.  And his allegation that "when the New York

Division of Human Rights asked [Balchem] to provide evidence of their accusations against

Plaintiff, they failed to provide evidence that Plaintiff had done any such thing of which they

falsely accused Plaintiff" is repeated 28 times.  Other paragraphs are similarly repeated.  "Simply

reading the [Amended] Complaint is a task of several hours' duration, as [the Court] can attest."

*Benzo*, 1997 WL 37961, at *4.

      While Plaintiff's Amended Complaint certainly comes close to warranting dismissal

under Rule 8, and the Court laments failing to order Plaintiff to file a less wieldy complaint

before proceeding to motion practice, the Court will not dismiss Plaintiff's Amended Complaint

based on Rule 8 at this time.  The Court "remain[s] obligated to construe a pro se complaint

liberally." *Harris v. Mills,* 572 F.3d 66, 72 (2d Cir. 2009).  "A document filed pro se is to be

liberally construed, and a pro se complaint, however inartfully pleaded, must be held to less

stringent standards than formal pleadings drafted by lawyers." *Erickson*, 551 U.S. at 94 (italics

and citation omitted).  The Second Circuit has explained that "[t]his policy of liberally

22

construing pro se submissions is driven by the understanding that '[i]mplicit in the right of self-representation is an obligation on the part of the court to make reasonable allowances to protect pro se litigants from inadvertent forfeiture of important rights because of their lack of legal training.'" *Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 475 (2d Cir. 2006) (quoting *Traguth v. Zuck*, 710 F.2d 90, 95 (2d Cir. 1983)).[21]  However, if Plaintiff choses to file a Second Amended Complaint, he *must* abide by Rule 8 and avoid repeating himself.  The Court will not accept a Second Amended Complaint of this length and repetitious nature.[22]

### 2.  Title VII Claims Against Individual Defendants

To the extent Plaintiff asserts Title VII claims against the Individual Defendants in the first and second causes of action, Defendants argue the claims should be dismissed because individuals may not be held personally liable for alleged violations of Title VII.  (Defs.' Mem. Law 6.)  Plaintiff does not dispute this, (Pl.'s Mem. 20), nor could he as "individuals are not subject to liability under Title VII," *Wrighten v. Glowski*, 232 F.3d 119, 120 (2d Cir. 2000) (per curium); *see also Patterson v. Cty. of Oneida, N.Y.*, 375 F.3d 206, 226 (2d Cir. 2004) ("Title VII

---

[21] It bears noting, however, that this is not Plaintiff's first federal case.  *See Kamdem-Ouaffo v. Pepsico, Inc.*, 160 F. Supp. 3d 553 (S.D.N.Y.), *aff'd*, 657 F. App'x 949 (Fed. Cir. 2016), *cert. denied*, 137 S. Ct. 1096 (2017).

[22] For example, in the Second Amended Complaint, Plaintiff need not include the exact same paragraph in every section of the Complaint.  (*See, e.g.*, Am. Compl. (alleging that "Plaintiff[']s employment contract with Balchem Corporation made written provisions that upon meeting 'key performance objectives,' Plaintiff was eligible for 'an increase' on 'salary'" appearing in facts section for each Defendant and again in section for each cause of action).)  Additionally, rather than repeating the same allegations against each Defendant, when alleging identical conduct by multiple Defendants, Plaintiff can include those allegations in the same paragraph and name each applicable Defendant.  (*See, e.g.*, Am. Compl. ¶¶ 131, 159, 194, 230, 265 (alleging in separate paragraphs that neither McComb, Harris, Kuehner, Larsen, nor Sestrick ordered or "conduct[ed] any meaningful investigation of the incidents, rather [they] tried to find information and to devise [a] cover up").)  And, Plaintiff need not repeat allegations in the fact section under each cause of action; rather, Plaintiff may incorporate paragraphs by reference and should specifically plead how each element of each cause of action is met.

claims are not cognizable against individuals.").  Therefore, Plaintiff's claims against the

Individual Defendants in the first and second causes of action are dismissed with prejudice, as no

amendment can cure this defect.

### 3.  Wrongful Termination

Defendants argue Plaintiff's New York state law claim of wrongful discharge must be

dismissed, because New York does not recognize tort liability for abusive or wrongful discharge.

(Defs.' Mem. 6–8.)  The New York Court of Appeals has unequivocally held that there is no

independent cause of action in tort for wrongful discharge of an employee.  *See Murphy v. Am.*

*Home Prods. Corp.*, 448 N.E.2d 86, 87 (N.Y. 1983) ("This court has not and does not now

recognize a cause of action in tort for abusive or wrongful discharge of an employee; such

recognition must await action of the Legislature."); *see also Sullivan v. Harnisch*, 969 N.E.2d

758, 759 (N.Y. 2012) ("We held in *Murphy* . . . and have several times reaffirmed, that New

York common law does not recognize a cause of action for the wrongful discharge of an at-will

employee.").  In *Murphy*, the plaintiff alleged he was dismissed for two reasons: because of his

disclosure to top management of alleged accounting improprieties on the part of corporate

personnel and because of his age, and attempted to bring a cause of action in tort for abusive or

wrongful discharge.  *See Murphy*, 448 N.E.2d at 87.  The New York Court of Appeals rejected

the plaintiff's invitation to "recognize the tort of abusive or wrongful discharge of an at-will

employee," because "[t]o do so would alter [New York's] long-settled rule that where an

employment is for an indefinite term it is presumed to be a hiring at will which may be freely

terminated by either party at any time for any reason or even for no reason."  *Id.* at 89.  The New

York Court of Appeals believed that the plaintiff's desired change in law was best effected by

the legislature, which had already provided certain express statutory protections to employees—

24

including for discriminatory practices. *Id.* at 90 n.1 (citing, *inter alia*, N.Y. Exec. Law § 296 (barring employers from engaging in discriminatory practices)).

Under New York law, "employment for an indefinite or unspecified term is presumed to be at will and freely terminable by either party at any time without cause or notice." *Brown v. Daikin Am. Inc.*, 756 F.3d 219, 231 (2d Cir. 2014) (alterations and internal quotation marks omitted); *Dreyfuss v. eTelecare Glob. Sols.-US, Inc.*, No. 08-CV-1115, 2010 WL 4058143, at *4 (S.D.N.Y. Sept. 30, 2010) ("Under New York law, 'an employer has the right to terminate an at-will employee at any time for any reason or for no reason, except where that right has been limited by express agreement.'" (quoting *Sabetay v. Sterling Drug, Inc.*, 506 N.E.2d 919, 921 (N.Y. 1987)).[23]  Plaintiff's March 26, 2015 Offer Letter makes abundantly clear that he was an at-will employee.  (Offer Letter 94.)  The disclaimer states:

> Nothing in this offer is intended to be, nor should it be, construed as a guarantee that employment or any benefit will be continued for any period of time. Employment is "at-will," meaning that you have the right to terminate your employment at any time, with or without cause or notice, and the Company has the same right.

(*Id.*)

In dismissing the breach of contract claim, the New York Court of Appeals in *Murphy* concluded "[i]n sum, under New York law as it now stands, absent a constitutionally

---

[23] An employee may rebut the presumption of at-will employment, however, by demonstrating an "express limitation in the individual contract of employment curtailing an employer's right to terminate at will." *Baron v. Port Auth. of N.Y. & N.J.*, 271 F.3d 81, 85 (2d Cir. 2001) (internal quotation marks omitted).  However, "[t]he New York Court of Appeals has admonished that this is a difficult pleading burden and that [r]outinely issued employee manuals, handbooks and policy statements should not lightly be converted into binding employment agreements."  *Id.* (internal quotation marks, footnote, and alteration omitted).  Here, Plaintiff does not allege such an express limitation nor does the Offer Letter contain such a limitation, thus, Plaintiff has failed to overcome the presumption of at-will employment.

impermissible purpose, a statutory proscription, or an express limitation in the individual contract of employment, an employer's right at any time to terminate an employment at will remains unimpaired."  448 N.E.2d at 91.  Contrary to Plaintiff's assertion, (Pl.'s Mem. 10), this holding does not create a tort of wrongful termination for violations of the constitution or breach of contract.  The alleged violations of federal and state anti-discrimination laws are not torts under New York law.  *See Treanor v. Metro. Transp. Auth.,* 414 F. Supp. 2d 297, 303 (S.D.N.Y. 2005) ("New York cases reason[ ] that a discrimination claim is not a tort because it is 'a new statutory cause of action which was not cognizable at common law.'" (quoting *Picciano v. Nassau Co. Civil Serv. Comm'n*, 736 N.Y.S.2d 55, 60 (App. Div. 2001))); *Monsanto v. Electronic Data Sys. Corp.*, 529 N.Y.S.2d 512, 515 (App. Div. 1988) (citing *Murphy*, 448 N.E.2d at 93) ("[A] discrimination claim under the Human Rights Law is an action created by statute, which did not exist at common law, and therefore cannot give rise to tort liability."); *see also Lane-Weber v. Plainedge Union Free Sch. Dist.*, 624 N.Y.S.2d 185, 186 (App. Div. 1995) ("[A]n action brought pursuant to [New York's employment discrimination statute] is not a tort claim.").  Therefore, Plaintiff's reliance on Balchem's alleged violation of federal and state anti-discrimination laws cannot sustain a cause of action for tortious wrongful termination.  Plaintiff's allegations regarding Defendants' breach of contract are discussed below.  Thus, Defendants' Motion To Dismiss the third cause of action for wrongful termination claim is granted, and the claim is dismissed with prejudice, as no amendment can change the law on this point.[24]

---

[24] Plaintiff's claims for state law unconstitutional termination are better pled under New York State Human Rights Law, in addition to his federal claims under Title VII.  *See* N.Y. Exec. Law §§ 290 *et. seq*.  These mirror the federal obligations under Title VII, *Brown*, 756 F.3d at 226, and the two claims are typically analyzed in tandem, *Reed v. A.W. Lawrence & Co., Inc.*, 95 F.3d 1170, 1177 (2d Cir. 1996) ("We consider [plaintiff's] state law claims in tandem with her Title VII claims because New York courts rely on federal law when determining claims under the New York [State] Human Rights Law.").

4.  Breach of Contract

Defendants argue Plaintiff's fourth cause of action for breach of contract fails to state a

claim.  (Defs.' Mem. 8–12.)  "Under New York law, a breach of contract claim requires proof of

(1) an agreement, (2) adequate performance by the plaintiff, (3) breach by the defendant, and

(4) damages."  *Fischer & Mandell, LLP v. Citibank, N.A.*, 632 F.3d 793, 799 (2d Cir. 2011); *see*

*also Brualdi v. IBERIA*, 913 N.Y.S.2d 753, 754 (App. Div. 2010) (same).  To establish that the

Parties formed a contract, Plaintiff must show that there was "an offer, acceptance,

consideration, mutual assent and intent to be bound."  *Leibowitz v. Cornell Univ.*, 584 F.3d 487,

507 (2d Cir. 2009); *see also Twomey v. Quad/Graphics, Inc.*, No. 13-CV-1109, 2015 WL

5698002, at *11 (S.D.N.Y. Sept. 28, 2015) (same).  Plaintiff alleges Defendants breached his

"employment contract" with Balchem, which Plaintiff claims contained written promises that

Plaintiff would be provided a salary increase upon meeting key performance objectives.  (Am.

Compl. ¶ 14.)[25]  Additionally, Plaintiff alleges Defendants breached "verbal provisions" made

during his employment negotiations with Balchem providing "that should Plaintiff meet key

performance objectives and that should Plaintiff develop patented technologies/processes or

products, Plaintiff will be rewarded financially with [a] substantial amount of pay bonuses

commensurate with the potential and value of the inventions and that the company will open a

---

[25] Plaintiff's references to the "Employment Contract" appear to be referring to the
March 26, 2015 Offer Letter.  (*See* Am. Compl. ¶ 15 (citing Am. Compl. Ex. VI ("Offer Letter")
(Dkt. No. 24)).)  The Offer Letter provides: "Upon the completion of six months from your
official hire date as you transition into your new role, your salary will be re-evaluated based on
meeting key performance objectives as set forth by your manager, after which time you may be
eligible for an increase on your base salary."  (Offer Letter 93.)
    The Court may consider the Offer Letter, which is attached as an exhibit to the Amended
Complaint.  *See Subaru Distribs. Corp. v. Subaru of Am., Inc.*, 425 F.3d 119, 122 (2d Cir. 2005)
("[T]he court may consider any written instrument attached to the complaint as an exhibit or
incorporated in the complaint by reference, as well as documents upon which the complaint
relies and which are integral to the complaint.").

laboratory for Plaintiff where Plaintiff will be able to establish himself for the rest of his industry career."  (*Id.* ¶ 15.)[26]  The Court addresses the claims under the Offer Letter and the claims under the verbal agreement in turn.

In New York, "an employer has the right to terminate an at-will employee at any time for any reason or for no reason, except where that right has been limited by express agreement." *Dreyfuss*, 2010 WL 4058143, at *4 (quoting *Sabetay*, 506 N.E.2d at 921)).  However, "[t]he law is also clear . . . that an at-will employee can prevail on a breach of contract claim against his employer arising out of an employment agreement."  *Id.*  "In other words, an employer may terminate an at-will employee, but he cannot retroactively change the terms of the employment agreement he entered into with that employee."  *Id.*  Rather, the employer is "entitled to change the terms of the employment agreement only prospectively, subject to [the employee's] right to leave the employment if the new terms [are] unacceptable."  *Gebhardt v. Time Warner Entm't–Advance/Newhouse*, 726 N.Y.S.2d 534, 535 (App. Div. 2001).  As such, when an employer alters

---

[26] As Defendants point out, it is well settled that "New York law does not recognize a breach of contract claim arising from the termination of an at-will employment."  *Fried v. LVI Servs., Inc.*, No. 10-CV-9308, 2011 WL 2119748, at *8 (S.D.N.Y. May 23, 2011); *see also Benson v. North Shore–Long Island Jewish Health Systs.*, 482 F. Supp. 2d 320, 331 (E.D.N.Y. 2007) ("Although it is unlawful for an employer to terminate an employee for discriminatory reasons, the proper remedy for a person aggrieved in this matter is not a cause of action for breach of contract."); *Abdullah v. Skandinaviska Enskilda Banken Corp.*, No. 98-CV-7398, 1999 WL 945238, at *9 (S.D.N.Y. Oct. 19, 1999) ("Under New York law, absent an agreement establishing a fixed duration, an employment relationship is presumed to be a hiring at will terminable at any time by either party." (internal quotation marks and alterations omitted)); *Sabetay*, 506 N.E.2d at 920 ("It is still settled law in New York that, absent an agreement establishing a fixed duration, an employment relationship is presumed to be a hiring at will, terminable at any time by either party . . . .").  To the extent Plaintiff brings such a claim, it is dismissed.  However, the Court does not only construe Plaintiff's breach of contract claim as alleging he was terminated in violation of his Offer Letter, as Plaintiff also alleges he was entitled to certain benefits while employed at Balchem that it failed to provide him.  (Am. Compl. ¶¶ 14–15.)

the terms of an employment agreement prospectively, the employee has the choice between leaving the job or staying and being "deemed to have agreed" to the new arrangement. *Id.*

Defendants argue that based on the disclaimer in the Offer Letter, the Parties never formed a contract, and thus the Offer Letter is not a binding and enforceable contract. (Defs.' Mem. 9.)  Indeed, the Offer Letter contains a disclaimer stating: "[n]othing in this offer is intended to be, nor should it be, construed as a guarantee that employment or any benefit will be continued for any period of time.  Employment is 'at-will,' meaning that you have the right to terminate your employment at any time, with or without cause or notice, and the Company has the same right."  (Offer Letter 94.)  In support of dismissal, Defendants rely on *Moore v. Thomson Reuters (GRC) Inc.*, No. 17-CV-211, 2017 WL 4083582, at *3 (S.D.N.Y. Sept. 14, 2017), *appeal dismissed* (Mar. 19, 2018), which rejected a breach of contract claim based on an offer letter disclaimer expressly stating that "nothing in this offer letter should be construed as creating a contract of employment" and "*no representation . . . can constitute a contract of employment . . . other than a document signed by the Human Resources Director*," and *Barker v. Time Warner Cable, Inc.*, No. 016438/08, 2009 WL 1957740, at *4 (N.Y. Sup. Ct. July 1, 2009), *aff'd*, 923 N.Y.S.2d 118 (App. Div. 2011), which also rejected a breach of contract claim, because the offer letter "plainly stated" that it was "not a contract of employment or a guarantee of employment or compensation."  (Defs.' Mem. 9.)

The Court finds these cases inapplicable to the circumstances here, because Plaintiff does not appear to be alleging Balchem altered the terms of the Offer Letter agreement prospectively. Although not the model of clarify, Plaintiff's theory of recovery for breach of the Offer Letter includes claims that Plaintiff was owed additional income for having met performance objectives prior to his termination.  (Am. Compl. ¶¶ 14–15.)  Plaintiff also alleges he "had [a] vacation

balance and it was not paid for," and the Offer Letter does provide for vacation days.  (*Id.*

¶ 542.)[27]  The facts here more closely align with *Arakelian v. Omnicare, Inc.*, 735 F. Supp. 2d 22

(S.D.N.Y. 2010), where the plaintiff brought a breach of contract claim based on the defendant's

failure to pay severance benefits due upon termination.  *Id.* at 32.  The court considered an offer

letter disclaimer worded similarly to the one at issue here, and concluded the offer letter was

valid contract for at will-employment.  *Id.*  More specifically, the offer letter stated "[w]hile this

letter is our commitment to employ you in the previously mentioned position, please understand

that it does not constitute a contract or promise of employment *for any specific length of time*."

*Id.* (emphasis added).  The court then held that the "phrase does not mean that the [o]ffer [l]etter

is not a contract; rather, it means that [the plaintiff] will be an at-will employee 'subject to

discharge at any time.'" *Id.* (quoting *Leibowitz v. Bank Leumi Trust Co. of N.Y.*, 548 N.Y.S.2d

513, 516 (App. Div. 1989)).  Thus, "[b]y signing the [o]ffer [l]etter, [the plaintiff] entered into a

valid and enforceable contact with [the defendant], albeit a valid and enforceable at-will

employment contract."  *Id.*

　　　*Arakelian* is in accord with New York law and applicable to the facts here.  To begin,

"reference to an employment at will policy does not bar the Offer Letter from operating as a

valid contract."  *Broyles v. J.P. Morgan Chase & Co.*, No. 08-CV-3391, 2010 WL 815123, at *3

(S.D.N.Y. Mar. 8, 2010) (collecting cases).  And, "[u]nder New York law, an employer's

virtually unfettered power to terminate an at-will employee does not negate its duty to abide by

promises made prior to termination."  *Parker v. Columbia Pictures Indus.*, 204 F.3d 326, 339 (2d

---

[27] Plaintiff alleges he was "offered no severance," (*id.* ¶ 541), and "health insurance and other benefits were also terminated immediately with his employment," (*id.* ¶ 543), however, he does not allege that the Offer Letter or the verbal agreement entitled him to severance or continuation of his benefits after termination.  Thus, the Court will not consider these claims as allegations of specific breaches of the contracts.

Cir. 2000).  For example, a company benefits plan may constitute a binding promise regardless of the employee's status.  *See id.*; *Leonelli v. Pennwalt Corp.*, 887 F.2d 1195, 1196 (2d Cir. 1989) ("Obviously, the fact that [the plaintiff] was an employee at will, subject to discharge anytime, does not relieve [the defendant] of the obligation . . . of living up to its promise to pay limited benefits to such employee when he is incapacitated or ill.").  Similarly, a breach of contract claim can be brought against an employer who refuses to pay an employee commissions earned prior to the employee's termination.  *Dreyfuss*, 2010 WL 4058143, at *5 (granting summary judgment in favor of the plaintiff for breach of contract claim seeking commissions earned prior to his termination).  Further, like the contract language in *Arakelian*, and unlike the contract language in *Moore* and *Barker*, the disclaimer here does not disavow that the Offer Letter is a "contract," rather, it solely disavows that the Offer Letter is a contract or agreement for a fixed term of employment.  (Offer Letter 94 ("Nothing in this offer is intended to be, nor should it be, construed as a guarantee that employment or any benefit will be continued *for any period of time*." (emphasis added).)  Plaintiff thus has plausibly pled that he and Balchem entered into a valid and enforceable contract for at-will employment.  *See Broyles*, 2010 WL 815123, at *3 ("[R]eference to an employment at will policy does not bar the [o]ffer [l]etter from operating as a valid contract."); *JCS Controls, Inc. v. Stacey*, 870 N.Y.S.2d 679, 681 (App. Div. 2008) ("We further agree with the [lower] court . . . that the terms set forth in the March 1998 employment agreement, which was signed by [the] plaintiff's president, are binding on [the] plaintiff [employer] despite [the] defendant's [employee] status as an at-will employee."); *see generally Parker*, 204 F.3d at 339 ("In *Leonelli*, we rejected a defendant's argument that because the plaintiff was an at-will employee, he could not state a breach of contract claim for denial of benefits." (citing *Leonelli*, 887 F.2d at 1198)).

31

Nonetheless, the breach of contract claim for the salary increase Plaintiff was allegedly owed after meeting key performance objectives fails because Plaintiff has not sufficiently alleged that Defendants breached the Offer Letter. The alleged breach of the written agreement is based on the Offer Letter's statement that "[u]pon the completion of six months from your official hire date as you transition into your new role, your salary will be re-evaluated based on meeting key performance objectives as set forth by your manager, after which time you *may* be eligible for an increase on your base salary." (Offer Letter 93 (emphasis added).) The word "may" is permissive, and cannot be interpreted as a binding promise to increase Plaintiff's salary. *See Karmilowicz v. Hartford Fin. Servs. Grp.*, No. 11-CV-539, 2011 WL 2936013, at *6 (S.D.N.Y. July 14, 2011), *aff'd sub nom. Karmilowicz v. Hartford Fin. Servs. Grp., Inc.*, 494 F. App'x 153 (2d Cir. 2012) (rejecting claim that "[the] [d]efendant's agent had explicitly promised that particular prior awards would be paid out" because "he manifestly did not, since 'might' does not mean 'will'"); *New York State Elec. & Gas Corp. v. Aasen*, 550 N.Y.S.2d 223, 225 (App. Div. 1990) ("Defendants seek to have the term 'may' mean 'shall' in this context. . . . The word 'may' provides for a permissive and not a mandatory meaning within the context of the option agreement."). Review of the Offer Letter shows repeated use of the word "will" when describing certain benefits Plaintiff would receive—such as a relocation stipend, vacation time, and travel accident insurance—suggesting those are mandatory, while the clause providing for a reevaluation of Plaintiff's salary is couched in permissive language. *See New York State Elec. & Gas Corp.*, 550 N.Y.S.2d at 225 (contrasting the "repeated use of the word 'shall' in a mandatory mode with other terms and conditions" and the use of the word "may"); *see also Lucadou v. United States*, 98 F. Supp. 946, 948 (S.D.N.Y. 1951) (concluding "[a] more reasonable interpretation of" a clause containing the word "may . . . is that it was permissive in character

and did not require" a certain action); *accord Leichter v. Lebanon Bd. of Educ.*, 917 F. Supp. 2d

177, 186 (D. Conn. 2013) (noting that "[t]he Connecticut Supreme Court explained that the word

'may,' unless the context in which it is employed requires otherwise, is not normally used as a

word of command . . . The term 'may' generally imports permissive conduct and the use of

discretion." (internal quotation marks omitted)).   On the basis of the plain language of the Offer

Letter, Plaintiff's breach of contract claim regarding the salary increase is dismissed.  *See*

*Kamdem-Ouaffo v. Pepsico, Inc.*, No. 14-CV-227, 2015 WL 1011816, at *7 (S.D.N.Y. Mar. 9,

2015) (dismissing breach of contract claim "on the basis of the plain language" of the

agreement); *Homeward Residential, Inc. v. Sand Canyon Corp.*, 298 F.R.D. 116, 129 (S.D.N.Y.

2014) ("Where a contract's language is clear and unambiguous, a court may dismiss a breach of

contract claim on a Rule 12(b)(6) motion to dismiss.").[28]

Regarding payment of vacation days, Plaintiff may have a breach of contract claim for

unpaid vacation days; however, Plaintiff must allege this claim with more specificity.  Plaintiff's

sole allegation is that "Plaintiff had vacation balance and it was not paid for."  (Am. Compl.

¶ 542).  Plaintiff has not alleged how many vacations days he had, how much money was owed,

and, more importantly, whether he was even entitled to payment of unused vacation days under

the terms of any contract.  *See Sell It Soc., LLC v. Strauss*, No. 15-CV-970, 2018 WL 2357261,

at *16 (S.D.N.Y. Mar. 8, 2018) (granting summary judgment on breach of contract clam for

---

[28] The Court also notes that it is possible that Plaintiff may have acquiesced to changes in
his compensation under both the written and alleged oral promise by choosing to stay employed
if Balchem modified the employment terms prior to Plaintiff allegedly achieving the key
performance objectives.  (*See* Defs.' Mem. 10.)  The timeline in Plaintiff's Amended Complaint
is not clear regarding when Plaintiff was informed he would not be receiving the salary increase
and/or bonus and whether this was before or after Plaintiff achieved key performance objectives.
Plaintiff's Amended Complaint, should he chose to file one, should specifically plead what
retroactive changes were made to his employment agreement that would entitle him to relief and
when those changes were made.

unused paid vacation and sick days because the employee handbook "does not address the accrual and payment of unused vacation and sick days, and no other provision provides for the accrual of unused vacation time or sick days or for an employee to receive payment for unused vacation time or sick days.").

Plaintiff's claim that he is entitled to a bonus or a new laboratory under a verbal agreement reached with Defendants also fails to state a claim. Other courts have found such an "argument flies in the face of well-settled law" in rejecting nearly identical claims. *Stamelman v. Fleishman-Hillard, Inc.*, No. 02-CV-8318, 2003 WL 21782645, at *3 (S.D.N.Y. July 31, 2003). "A contract which appears complete on its face is an integrated agreement as a matter of law." *Id.* (alteration and internal quotation marks omitted). An employment agreement that "identifie[s] [a] plaintiff's title, salary, estimated start date, vacation days, and benefits, [is] an integrated agreement." *Johnson v. Stanfield Capital Partners, LLC*, 891 N.Y.S.2d 383, 384 (App. Div. 2009); *see also Stamelman*, 2003 WL 21782645, at *3 ("A letter of confirmation indicating the prospective employee's title, including a geographic specification, salary, start date and benefits may be considered complete on its face."). Here, the Offer Letter includes all such information, except for the estimated start date, which is marked as "TBD." (Offer Letter 93.) As such, "parol evidence [is] inadmissible to vary its terms." *Johnson*, 891 N.Y.S.2d at 384; *Stamelman*, 2003 WL 21782645, at *3 (holding that where the offer letter is an integrated agreement, "evidence of a prior oral agreement that modifies the terms of the agreement is excluded by the parol evidence rule"). Additionally, where "the bonus component of compensation dwarfs [a] plaintiff's stated base salary component, the parties would be expected to make reference to such a large sum of money in the written agreement with particularity." *Johnson*, 891 N.Y.S.2d at 384 (alterations and internal quotation marks omitted). Here, Plaintiff

alleges he earned a salary of more than $75,000 a year and there was a verbal agreement entitling Plaintiff to a bonus set "at about 25% of the profit potential of the technology and new products as [is] typically . . . the case in academia," (Am. Compl. ¶ 365), and that he "personally valued the technology and products thereof to several billions of dollars," (*id.* ¶ 369).  Twenty-five percent of "several billions" certainly dwarfs Plaintiff's base salary, and exclusion of such a provision from the written agreement seems implausible.  Thus, the Court will not construe the alleged oral promises to vary the terms of the written agreement.  *See Johnson*, 891 N.Y.S.2d at 384 (rejecting the plaintiff's allegation that the defendant breached an oral promise to create a bonus pool equal to 15% of hedge fund revenues to pay bonuses to the plaintiff an others in his department to vary the terms of the written employment agreement).  Accordingly, the Court grants Defendants' Motion to dismiss the fourth cause of action for breach of contract without prejudice.

### 5.  Intentional Infliction of Emotional Distress

Defendants argue Plaintiff's fifth cause of action alleging intentional infliction of emotional distress should be dismissed, because Plaintiff "fails to allege conduct that is extreme or outrageous as a matter of law."  (Pl.'s Mem. 12–15.)  Plaintiff alleges that the altercation with Oenga, placing Plaintiff on a PIP, and terminating his employment demonstrate outrageous conduct.  (Pl.'s Mem. 30–34.)

In New York, an intentional infliction of emotional distress claim "has four elements: (i) extreme and outrageous conduct; (ii) intent to cause, or disregard of a substantial probability of causing, severe emotional distress; (iii) a causal connection between the outrageous conduct and injury; and (iv) severe emotional distress."  *Howell v. New York Post Co.*, 612 N.E.2d 699, 702 (N.Y. 1993).  New York courts been extremely reluctant to find the first element of this test

satisfied.  *See Murphy*, 448 N.E.2d at 90; *Turley v. ISG Lackawanna, Inc.*, 774 F.3d 140, 158 (2d Cir. 2014) ("[Intentional infliction of emotional distress]. . . remains a highly disfavored tort under New York law." (alteration and internal quotation marks omitted)).  Conduct only qualifies as "extreme and outrageous" if it is "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community."  *Murphy*, 448 N.E.2d at 90 (internal quotation omitted).  "The element of outrageous conduct is 'rigorous, and difficult to satisfy,' and its purpose is to filter out trivial complaints and assure that the claim of severe emotional distress is genuine."  *Medcalf v. Walsh*, 938 F. Supp. 2d 478, 488 (S.D.N.Y. 2013) (quoting *Howell*, 612 N.E.2d at 702).  Indeed, the alleged conduct "must consist of more than mere insults, indignities, and annoyances."  *Leibowitz*, 548 N.Y.S.2d at 513 (internal quotation marks omitted); *see also Gorman v. Covidien, LLC*, 146 F. Supp. 3d 509, 535 (S.D.N.Y. 2015) ("Insults, bullying, and general harassment do not usually constitute a claim for [intentional infliction of emotional distress] under New York law.").

Plaintiff alleges he and Oenga had a verbal altercation, where Oenga "elevated his voice, stood up to open his office door and asked Plaintiff to take his belongings to HR never to return again." (Am. Compl. ¶ 56.)  Oenga also called Plaintiff a "hell employee."  (Aug. 17, 2016 Pl. Letter 36.)  Plaintiff further alleges he was "savagely harassed" during the altercation, but provides few details.  (*Id.* ¶ 302.)  These allegations fail to reach a level of extreme and outrageous conduct.  In *Leibowitz*, the New York state court rejected a claim for intentional infliction of emotional distress based on a plaintiff's allegations she was subject to frequent religious and ethnic slurs by her colleagues, because while the religious and ethnic slurs allegedly hurled at the plaintiff demonstrated "narrowmindedness and meanspiritedness," their

use did not rise to such an extreme or outrageous level as to meet the threshold requirements of

the tort.  548 N.Y.S.2d at 521.  *Id.*; *see also Spence v. Maryland Casualty Co.*, 995 F.2d 1147,

1158 (2d Cir. 1993) ("[The] [d]efendants' criticisms of [the plaintiff's] job performance and their

conditional threats of termination . . . fall far short of the 'extreme' and 'outrageous' conduct that

is actionable as an intentional infliction of emotional distress."); *Biberaj v. Pritchard Indus., Inc.*,

859 F. Supp. 2d 549, 565 (S.D.N.Y. 2012) (grating summary judgment because supervisors and

co-workers calling the plaintiff "names and insult[ing] her 'many times,'" was insufficiently

extreme and outrageous); *Elmowitz v. Exec. Towers at Lido, LLC*, 571 F. Supp. 2d 370, 379

(E.D.N.Y. 2008) (finding claims the defendant "taunted" the plaintiff in public by shouting

"derogatory remarks" and "hit him multiple times with her office telephone" as a result of his

disability did not "approach[] the level of 'extreme and outrageous,' let alone 'atrocious and

utterly intolerable.'" (alterations omitted)).[29]

Additionally, Plaintiff's allegations that placing him on the PIP and his eventual

termination constituted "outrageous" conduct similarly fail "to go beyond all possible bounds of

decency, and to be regarded as atrocious, and utterly intolerable in a civilized community."

*Murphy*, 448 N.E.2d at 90; *see Day v. City of New York*, No. 15-CV-4399, 2015 WL 10530081,

at *3, 9, 19 (S.D.N.Y. Nov. 30, 2015), *adopted by* 2016 WL 1171584 (S.D.N.Y. Mar. 22, 2016)

(dismissing intentional infliction of emotional distress claim alleging that the defendant

---

[29] *Kaminski v. United Parcel Service*, 501 N.Y.S.2d 871 (App. Div. 1986), is easily
distinguished from the facts Plaintiff has alleged.  There, the plaintiff alleged that the defendants
accused him of stealing money, and for three hours threatened him with a criminal prosecution
and a prison term at Rikers Island if the plaintiff did not admit to stealing the money, agree to
return the money, resign, and waive his rights to all health, hospital, and pension benefits.  *Id.* at
872.  The "threats . . . were accompanied by loud, aggressive, profane and obscene language and
gestures.  At all times one or another of the defendants was blocking the door to the office."  *Id.*
Oenga's alleged conduct pales in comparison.

coworkers "were hostile towards plaintiff" and "gave plaintiff a special set of rules" regarding

his workplace conduct); *Gorman*, 146 F. Supp. at 535 (finding defendant employers "hostile

demeanor when presenting [the plaintiff] with the PIP, if true, may well have been insulting.

However, they do not rise to the level of 'utterly intolerable in a civilized community'");

*Sharabura v. Taylor*, No. 03-CV-1866, 2003 WL 22170601, at *4 (E.D.N.Y. Sept. 16, 2003)

("[The plaintiff's] assert[ions] that her employer criticized her unfairly, gave her undesirable

assignments and ultimately terminated her . . . do not meet New York's high threshold for

conduct that is actionable under the tort of intentional infliction of emotional distress."); *Lydeatte*

*v. Bronx Overall Econ. Dev. Corp.*, No. 00-CV-5433, 2001 WL 180055, at *2 (S.D.N.Y. Feb.

22, 2001) (dismissing an intentional infliction of emotional distress claim where the plaintiff

alleged racial harassment, discrimination, and wrongful termination because "the behavior

alleged . . . even if done maliciously, simply fails to measure up to what is require to establish

this claim").  "New York courts appear to require that plaintiffs allege either an unrelenting

campaign of day in, day out harassment or that the harassment was accompanied by physical

threats, in order to state a cognizable claim for intentional infliction of emotional distress."

*Biberaj*, 859 F. Supp. 2d at 565 (internal quotation marks omitted).  There are no such

allegations here.

      To the extent Plaintiff attempts to impute Oenga's conduct to Balchem and the other

Individual Defendants, that claim is also dismissed.  "An employer may be liable for the torts of

an employee, provided the relevant behavior fell within the scope of employment."  *Turley*, 774

F.3d at 161.  However, if "motivated by something personal, harassment, however egregious,

ordinarily does not fall within the scope of employment."  *Id.*  That is not the case, however, if

the conduct is "work-related yelling."  *Higgins v. Metro–N. R.R. Co.*, 318 F.3d 422, 426 (2d Cir.

2003).  Even construing Plaintiff's Amended Complaint liberally to allege "work-related

outbursts" that could give rise to a claim of intentional infliction of emotional distress against

Balchem, the claim nonetheless fails because Oenga's conduct was not sufficiently outrageous to

survive the Motion.  *Id.* (stating that "work-related outbursts" giving rise to intentional infliction

of emotional distress claim can be imputed, but nonetheless granting summary judgment because

four incidents of the supervisor yelling and swearing at the employee did not constitute extreme

and outrageous conduct).

   Further, if Plaintiff is alleging intentional infliction of emotional distress as a result of the

Individual Defendants' failure to "conduct any meaningful investigation of the incidents," (*see,*

*e.g.*, Am. Compl. ¶ 131), that claim is also dismissed.  "Ordinarily, the failure to respond

appropriately to complaints of harassment, on its own, will not be sufficiently egregious—

'outrageous'—to amount to intentional infliction of emotional distress under New York law."

*Turley*, 774 F.3d at 161 (collecting cases).  In *Turley*, the Second Circuit upheld a jury verdict

finding an employer liable for intentional infliction of emotional distress as a result of a failure to

investigate harassment allegations where the supervisor employee was "personal witness to the

ongoing and severe indignity, humiliation, and torment to which the plaintiff was subjected over

a substantial period of time—and he was in a position to do something about it.  Instead, he

continuously failed to respond for more than three years, blocking others' efforts to investigate

serious threats, and, at times, seeming to encourage further harassment."  *Id.*  The court

contrasted these facts to a scenario where the employer "failed to respond to one workplace

complaint, however shocking the underlying behavior," stating "that might not be sufficiently

outrageous to constitute intentional infliction of emotional distress under New York law."  *Id.*

The court further explained that, "[e]ven a sluggish or incompetent response to two, three, or

four complaints might not rise to clear the high bar set for this tort in this State." *Id.* Here, Plaintiff's allegations that he twice reported the allegedly discriminatory "hoodie ban" to Human Resources, which failed to conduct a "meaningful investigation," fails to cross the high threshold into extreme and outrageous conduct as explained by the Second Circuit. *Turley*, 774 F.3d at 161. Plaintiff's allegations lack any suggestion that he was subjected, over a long period of time, to "ongoing and severe indignity, humiliation, and torment," and that anyone with the ability to remedy the situation was aware, or that those in power actively impeded investigations into the harassment and appeared to encourage it further. *Id.* Numerous districts courts in the Second Circuit have found similar allegations regarding an employer's failure to investigate alleged harassment fail to meet the high bar of extreme and outrageous conduct. *See, e.g.*, *Peffers v. Stop & Shop Supermarket Co. LLC*, No. 14-CV-3747, 2015 WL 5460203, at *3 (S.D.N.Y. June 9, 2015) (dismissing the plaintiff's claim that the defendant corporation failed to investigate claims that employees "harassed him, denigrated him, and threatened him with physical violence," and that the defendant corporation "failed to protect him from this conduct, and then terminated him based on unproven allegations" as insufficiently extreme or outrageous); *Gorman*, 146 F. Supp. 3d at 535 (holding allegation the defendant employer "failed to investigate adequately his discrimination claims," failed to support an intentional infliction of emotional distress claim because "[t]he failure to respond appropriately to complaints of harassment will serve as the basis for an [intentional infliction of emotional distress] claim only in the most egregious of cases"); *Sowemimo v. D.A.O.R. Sec., Inc.*, 43 F. Supp. 2d 477, 492 (S.D.N.Y. 1999) (finding the defendant corporation not liable because "even if [it] failed to adequately respond to [the plaintiff's] reports of harassment and discharged her based on a retaliatory motive, such action is not sufficient to meet the high threshold of extreme and

outrageous conduct set by New York courts"); *Gray v. Schenectady City Sch. Dist.*, 927

N.Y.S.2d 442, 445 (App. Div. 2011) (finding the defendant corporation's "mere inaction after

receiving complaints about [another employee's] behavior—which allegedly allowed him to

continue to engage in this behavior in spite of the notice regarding his actions—cannot be

considered the type of extreme and outrageous conduct that is utterly intolerable in a civilized

community" (internal quotation marks omitted)).

      Additionally, New York state courts have held that because there is "no cause of action in

tort in New York for abusive or wrongful discharge of an at-will employee, [a] plaintiff should

not be allowed to evade that conclusion or to subvert the traditional at-will contract rule by

casting his cause of action in terms of a tort of intentional infliction of emotional distress."

*Murphy*, 448 N.E.2d at 90; *accord Wang v. State Univ. of N.Y. Heath Scis. Ctr. at Stony Brook*,

470 F. Supp. 2d 178, 188 (E.D.N.Y. 2006) ("In the employment context, New York courts rarely

entertain claims of intentional infliction of emotional distress because of the fear that plaintiffs

will attempt to re-cast their discharge complaints as something else."), *aff'd*, 217 F. App'x 24 (2d

Cir. 2007).  Here, Plaintiff's allegations regarding his wrongful termination are identical to those

alleging intentional infliction of emotional distress, and thus Plaintiff's attempt to plead around

that aspect of New York state law is rejected.  *See Semper v. N.Y. Methodist Hosp.*, 786 F. Supp.

2d 566, 587 (E.D.N.Y. 2011) ("The courts are wary of allowing plaintiffs to recharacterize

claims for wrongful or abusive discharge as claims for intentional infliction of emotional

distress." (alteration omitted)); *Emmons v. City Univ. of N.Y.*, 715 F. Supp. 2d 394, 424

(E.D.N.Y. 2010) ("As a general proposition, adverse employment actions, even those based on

discrimination, are not sufficient bases for intentional infliction claims.") (collecting cases).

Therefore, Defendants' Motion as to Plaintiff's fifth cause of action for intentional infliction of emotional distress is granted.

### 6.  Negligence

Defendants argue Plaintiff's sixth cause of action alleging negligence should be dismissed because the claim is barred by the exclusivity provision of the New York Workers' Compensation Law.  (Defs.' Mem. 16.)  New York Workers' Compensation Law bars employees from maintaining common-law actions to recover damages arising out of employer's negligence.  *See* N.Y. Workers' Comp. Law § 29(6) ("The right to compensation or benefits under this chapter, shall be the exclusive remedy to an employee . . . when such employee is injured or killed by the negligence or wrong of another in the same employ."); *Patterson v. Xerox Corp.*, 732 F. Supp. 2d 181, 194 (W.D.N.Y. 2010) (holding "negligence claims asserted against [the employer] must also be dismissed because the New York State Worker's Compensation Law . . . exclusively governs negligence claims against employers"); *Johns v. Home Depot U.S.A., Inc.*, No. 03-CV-4522, 2005 WL 545210, at *8 (S.D.N.Y. Mar. 8, 2005) ("In New York, recovery for . . . injuries caused by an employer's negligence, is governed by the Workers' Compensation Law." (internal quotation marks omitted)), *aff'd sub nom.* 180 F. App'x 190 (2d Cir. 2006).  Under New York's Workers' Compensation scheme, "psychological or nervous injury precipitated by psychic trauma is compensable to the same extent as physical injury." *Id.* (internal quotation marks omitted).  Accordingly, Defendants' allegedly negligent actions that caused Plaintiff's emotional distress and firing are governed by the Workers' Compensation Law.  Hence, Defendants' Motion To Dismiss Plaintiff's sixth cause of action for negligence is granted.  This claim is dismissed with prejudice.

### 7.  Fraudulent Concealment

Defendants argue that Plaintiff's seventh cause of action alleging fraud should be dismissed, as a matter of law, because the conduct alleged does not state a claim for fraudulent concealment.  (Defs.' Mem. 17–19.)  What conduct Plaintiff alleges constituted fraudulent concealment is difficult to discern based on the Amended Complaint alone.  However, Plaintiff's Opposition to the Motion suggests this claim is based on Defendants' alleged destruction and concealment of documents from the EEOC and Division of Human Rights.  (Pl.'s Mem. 37–40.)

Plaintiff fails to state a claim for fraudulent concealment.  In *Mohammed v. Delta Air Lines, Inc.*, No. 08-CV-1405, 2011 WL 5553827 (E.D.N.Y. June 8, 2011), *adopted by* 2011 WL 5554269 (E.D.N.Y. Nov. 15, 2011), the court denied a plaintiff's motion to amend to add a cause of action for fraudulent concealment claim based on the plaintiff's contention that the defendant had video footage of the accident in question that it refused to provide.  *Id.* at *3.  Similar to Plaintiff's claims here, "[the] plaintiff attempt[ed] to bring independent tort claims for supposed discovery violations against the opposing party."  *Id.*  The court determined that amendment would be futile, as the New York Court of Appeals has held that "traditional remedies are sufficient to deter spoliation by opposing parties," thus, "[the] plaintiff may not employ independent causes of action based on the alleged violations."  *Id.* (citing *Ortega v. City of New York*, 876 N.E.2d 1189, 1197 (N.Y. 2007) (holding that that existing remedies available to courts for discovery violations—e.g., "precluding proof favorable to the spoliator . . . , requiring the spoliator to pay costs[,] . . . employing an adverse inference instruction at the trial[, and] . . . . [w]here appropriate, . . . dismissing the action or striking responsive pleadings, thereby rendering a judgment by default against the offending party"—are an adequate deterrence)).  The court in *Mohammed* explained that the "logic is applicable whether the claim is styled as spoliation,

43

fraudulent concealment, or fraudulent misrepresentation." *Id.*; *Ruel v. McGrath*, No. 12-CV-417, 2013 WL 12130427, at *8 (N.D.N.Y. June 21, 2013) ("[T]o the extent that this fraudulent concealment cause of action is primarily based upon spoliation, the [p]laintiffs have failed to state a cause of action against the . . . [d]efendants.").[30]  Accordingly, Plaintiff's claim for fraudulent concealment based on Defendants' alleged failure to produce requested documents is dismissed.

To the extent Plaintiff's Amended Complaint could be construed to allege spoliation from the destruction of said documents, that claim is dismissed for the same reasons.  The Second Circuit defines spoliation as "the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation."  *Byrnie v. Town of Cromwell, Bd. of Educ.*, 243 F.3d 93, 107 (2d Cir. 2001) (citation omitted).  However, New York State law does not recognize an independent cause of action for spoliation.  *Mohammed*, 2011 WL 5553827, at *3; *see also Landis v. Remington Arms Co.*, No. 11-CV-1377, 2012 WL 6098269, at *4 (N.D.N.Y. Dec. 7, 2012) (holding "spoliation of evidence, whether firstparty or third-party, and whether intentional or negligent, is not a valid cause of action under New York law"); *Ortega*, 876 N.E.2d at 1197 (declining "to recognize spoliation of evidence as an independent tort claim" in claim alleging third party, negligent spoliation); *Hillman v. Sinha*, 910 N.Y.S.2d 116, 117 (App. Div. 2010) (finding "no reason" *Ortega* does not apply "to a proposed independent tort of 'first-party negligent spoliation.'"); *Pharr v. Cortese*, 559 N.Y.S.2d 780, 782 (App. Div. 1990)

---

[30] In *Mohammed* and *Ruel*, the courts noted a New York Appellate Division decision holding a claim for fraudulent concealment could be brought for intentional concealment of discoverable material by *third parties* via the torts of fraudulent concealment and fraudulent misrepresentation.  *Mohammed*, 2011 WL 5553827, at *4 (citing *IDT. Corp. v. Morgan Stanley Dean Witter & Co.*, 882 N.Y.S.2d 60 (App. Div. 2009)); *Ruel*, 2013 WL 12130427, at *8.  Those holdings are inapplicable here, were Plaintiff has only alleged *first-party* fraudulent concealment.

(declining to recognize a cause of action for intentional spoliation of evidence).  The Court therefore grants Defendants' Motion as to seventh cause of action for fraudulent concealment, and dismisses this claim with prejudice.

### 8.  First Amendment Freedom of Religion

Defendants argue that Plaintiff's claim under 42 U.S.C. § 1983 alleging constitutional freedom of religion fails to state a claim because Plaintiff has conceded Balchem is a private entity that did not act under color of state law.  (Defs.' Mem. 20–21.)  In his response to Defendants' pre-motion letter, Plaintiff wrote the cause of action for freedom of religion "is voluntarily dismiss[ed] to the extent that Balchem is not a state actor."  (*See* Dkt. No. 26.)  It is unclear if Plaintiff has alleged the Individual Defendants violated his First Amendment rights.  If he has, those claims are dismissed because Plaintiff has not alleged that "a person acting under color of state law deprived him or her of a right secured by the Constitution or laws of the United States."  *Oliveira v. Price Law Firm*, No. 14-CV-4475, 2014 WL 4088199, at *2 (S.D.N.Y. July 30, 2014).  Thus, Defendants' Motion to dismiss the eighth cause of action is granted, and this claim is dismissed with prejudice.

### 9.  Breach of Fiduciary Duty

Defendants argue Plaintiff's ninth cause of action alleging breach of fiduciary duty should be dismissed.  (Defs.' Mem. 21.)  Under New York Law, in order to succeed on a cause of action for breach of a fiduciary duty, Plaintiff must allege "(1) the existence of a fiduciary duty, (2) breach of that duty by the defendant, and (3) damages."  *Barton v. Smartstream Techs., Inc.*, No. 16-CV-1718, 2016 WL 2742426, at *7 (S.D.N.Y. May 9, 2016) (alteration and internal quotation marks omitted).  "[A] fiduciary relationship arises only when one person is under a duty to act for or to give advice for the benefit of another upon matters within the scope of the

relation." *Id.* (alteration and internal quotation marks omitted).  Plaintiff does not allege that the

Individual Defendants owed him a fiduciary duty.  In any event, "an employer does not owe a

fiduciary duty to its employees simply by virtue of the employment relationship."  *Id.*; *see also*

*Rather v. CBS Corp.*, 886 N.Y.S.2d 121, 125 (App. Div. 2009) ("The law . . . in every reported

appellate-division-level case[ ] is that employment relationships do not create fiduciary

relationships.  Simply put, the employer did not owe plaintiff, as employee, a fiduciary duty."

(alteration and internal quotation marks omitted) (collecting cases)); *accord Wilson v. Dantas*,

No. 12-CV-3238, 2013 WL 92999, at *1 (S.D.N.Y. Jan. 7, 2013) (noting that "employers owe

current employees no fiduciary duties," and "similarly do not owe such duties to former

employees"), *aff'd*, 746 F.3d 530 (2d Cir. 2014).  Thus, Plaintiff has not articulated that any

Defendant had a fiduciary duty with respect to Plaintiff.  Plaintiff's claims for breach of fiduciary

duty fail to state a claim, and Defendants' motion to dismiss the ninth cause of action is granted

with prejudice.

### 10.  Defamation

Defendants argue that Plaintiff's tenth cause of action for libel, slander, and defamation is

barred by an absolute privilege.  (Defs.' Mem. 21–22.)  Plaintiff alleges that Balchem's written

position statement filed with the EEOC and Division of Human Rights regarding the

circumstances surrounding his termination was false, because it stated Plaintiff was terminated

"because of continued and ongoing performance failure," (Am. Compl. ¶ 18), and "falsely

accus[ed] Plaintiff of having taken pictures and publiciz[ed] sensitive laboratory information,"

(*Id.* ¶ 20).  Plaintiff alleges the real reason he was terminated was because of his religion.  (*Id.*

¶ 22.)

"To establish a claim for defamation under New York law, a plaintiff must prove that:
(1) the defendant published a defamatory statement of fact to a third party, (2) the statement of
fact was false, (3) the false statement of fact was made with the applicable level of fault, and
(4) either the false statement was defamatory per se or caused the plaintiff special
harm." *Medcalf*, 938 F. Supp. 2d at 485.  Plaintiff fails to state a claim for defamation, because
"[i]t is well settled in New York that statements made in quasi-judicial proceedings, including
proceedings by agencies such as the EEOC, are protected by an absolute privilege." *Farzan v.
Wells Fargo Bank*, No. 12-CV-1217, 2013 WL 474346, at *4 (S.D.N.Y. Jan. 25, 2013)
(alteration and internal quotation marks omitted), *adopted by* No. 12–CV–1217, 2013 WL
2641643 (S.D.N.Y. June 11, 2013).  The privilege applies "so long as [the statements] are
material and pertinent to the questions involved [in the proceedings]." *Bernstein v. Seeman*, 593
F. Supp. 2d 630, 636 (S.D.N.Y. 2009) (internal quotation marks omitted).  Here, Balchem's
position statement explaining why Plaintiff was terminated was submitted to the Division of
Human Rights and EEOC.  (Balchem Division of Human Rights Letter.)  Moreover, the
statement was directly related to one of the issues that the Division of Human Rights and EEOC
had been asked to decide: namely, the reasons for Plaintiff's termination.  (*See id.*)  Accordingly,
Defendants cannot be liable for defamation even if the statement was false.  *See Morales v. City
of New York*, No. 14-CV-7253, 2016 WL 9651130, at *8 (S.D.N.Y. Aug. 9, 2016) (holding that
"position statements to the [Division of Human Rights] and EEOC are entitled to absolute
immunity"); *Bernstein*, 593 F. Supp. 2d at 636 (dismissing allegations of defamation in
statements made in a submission to the EEOC "because both statements were made under the
protection of absolute immunity"); *Daniels v. Alvarado,* No. 03-CV-5832, 2004 WL 502561, at
*7–8 (E.D.N.Y. Mar. 12, 2004) (dismissing defamation claim based on employer's submission to

47

the Division of Human Rights, which was protected by absolute privilege).  Defendants' Motion

to dismiss the tenth cause of action is therefore granted, and Plaintiff's defamation claim is

dismissed with prejudice.

### 11. Good Faith and Fair Dealing

Plaintiff alleges that Defendants breached their implied duty of good faith and fair

dealing under the employment contract because Balchem failed to increase his salary or provide

him a bonus and private laboratory after meeting "key performance objectives."  (Am. Compl.

¶¶ 14, 15.)  Defendants argue that this claim should be dismissed as duplicative of Plaintiff's

breach of contract claim.  (Defs.' Mem. 22–23.)

"In New York, all contracts imply a covenant of good faith and fair dealing in the course

of performance."  *511 W. 232nd Owners Corp v. Jennifer Realty Co.*, 773 N.E.2d 496, 500 (N.Y.

2002).  This covenant is breached "when a party acts in a manner that, although not expressly

forbidden by any contractual provision, would deprive the other party of the right to receive the

benefits under their agreement."  *O'Neill v. Warburg, Pincus & Co.*, 833 N.Y.S.2d 461, 463

(App. Div. 2007) (internal quotation marks and citations omitted); *see also 511 W. 232nd

Owners Corp*, 773 N.E.2d at 501 ("This covenant embraces a pledge that neither party shall do

anything which will have the effect of destroying or injuring the right of the other party to

receive the fruits of the contract." (internal quotation marks omitted)).  "To avoid redundancy,

[c]laims of breach of the implied covenant must be premised on a different set of facts from

those underlying a claim for breach of contract."  *U.S. Bank Nat. Ass'n ex rel. Lima Acquisition

LP v. PHL Variable Ins. Co.*, No. 12-CV-6811, 2014 WL 998358, at *4 (S.D.N.Y. Mar. 14,

2014) (alteration and internal quotation marks omitted).  Thus, to prevail on such a claim, a

plaintiff must establish that the defendant violated an implied term " *apart from the terms of the*

*contract*" itself.  *Brooks v. Key Trust Co. Nat'l Assoc.*, 809 N.Y.S.2d 270, 272 (App. Div. 2006)

(internal quotation marks omitted).  If the alleged violation cannot be distinguished from the

explicit contractual obligations, then the claim is "properly dismissed as duplicative" of the

underlying contract claim.  *Id.*

       Plaintiff does not allege a claim for breach of the implied covenant of good faith and fair

dealing separate from his breach of contract claim.  Indeed, the allegations for both claims are

identical, and the claim should be dismissed.  *See Presbyterian Healthcare Servs. v. Goldman*

*Sachs & Co.*, No. 15-CV-6579, 2017 WL 1048088, at *13 (S.D.N.Y. Mar. 17, 2017) (granting

motion to dismiss because the plaintiff's "breach of the duty of good faith and fair dealing claim

is redundant of its breach of contract claim"); *Grant & Eisenhofer, P.A. v. Bernstein Liebhard*

*LLP*, No. 14-CV-9839, 2015 WL 1809001, at *4 (S.D.N.Y. Apr. 20, 2015) (granting motion to

dismiss claim based on the implied covenant of good faith and fair dealing because it was not

based "on allegations different than those underlying the accompanying breach of contract claim

and the relief sought [was] intrinsically tied to the damages allegedly resulting from the breach

of contract" (internal quotation marks omitted)); *Canstar v. J.A. Jones Const. Co.*, 622 N.Y.S.2d

730, 731 (App. Div. 1995) (dismissing claim for breach of an implied covenant of good faith and

fair dealing as the claim was "redundant" with the breach of contract claim because it was

"intrinsically tied to the damages already resulting from a breach of the contract"); *Apfel v.*

*Prudential-Bache Sec., Inc.*, 583 N.Y.S.2d 386, 387 (App. Div. 1992) ("The cause of action

alleging a breach of good faith is duplicative of a cause of action alleging breach of contract,

since every contract contains an implied covenant of good faith and fair dealing."); *see also*

*Halpern v. Tharaldson*, No. 15-CV-2037, 2016 WL 3883438, at *5 (D. Nev. July 18, 2016)

(dismissing claim for breach of the implied covenant of good faith and fair dealing because

"New York law is clear that claims for breach of contract and breach of the implied covenant are duplicative and cannot be pled in the alternative when based on the same predicate facts").

To the extent Plaintiff alleges his termination was a breach of the covenant of good faith and fair dealing separate from the alleged promises for a salary increase and bonus, that claim also is dismissed.  Addressing the implied covenant of good faith and fair dealing, the New York Court of Appeals has held repeatedly that "'[n]o obligation can be implied . . . which would be inconsistent with other terms of the contractual relationship.'"  *Horn v. N.Y. Times*, 790 N.E.2d 753, 756 (N.Y. 2003) (quoting *Murphy*, 448 N.E.2d at 91); *see also Gaia House Mezz LLC v. State St. Bank & Trust Co.*, 720 F.3d 84, 93 (2d Cir. 2013) (same).  Put another way, "[a] defendant does not breach its duty of good faith and fair dealing by exercising its rights under the contract."  *DCMR v. Trident Precision Mfg.*, 317 F. Supp. 2d 220, 226 (W.D.N.Y. 2004) (alterations and internal quotation marks omitted).  In the context of an at-will employment contract, this means that "it would be incongruous to say that an inference may be drawn that the employer impliedly agreed to a provision which would be destructive of his right of termination."  *Murphy*, 448 N.E.2d at 91.

Consistent with this policy, the New York Court of Appeals has declined to alter at-will employment relationships through the imposition of implied contractual terms.  *See Horn*, 790 N.E.2d at 759 ("The only exceptions to the employment-at-will rule ever adopted by [New York Court of Appeals] ha[s] involved very specific substitutes for a written employment contract . . . . [New York Court of Appeals] ha[s] consistently declined to . . . recognize a covenant of good faith and fair dealing to imply terms grounded in a conception of public policy into employment contracts . . . .").  *But see Wieder v. Skala,* 609 N.E.2d 105, 109 (N.Y. 1992) (applying covenant of good faith and fair dealing in the limited circumstances where the "unique

characteristics of the legal profession . . . make the relationship of an associate to a law firm

employer intrinsically different from that of . . . . financial managers to . . . corporate employers .

. . .").  For example, the Court of Appeals has rejected claims of implied contractual terms where

a plaintiff was discharged for "refus[ing] to participate in certain illegal activities," *Sabetay*, 506

N.E.2d at 920, where a plaintiff was discharged as the result of age discrimination, *see Murphy,*

448 N.E.2d at 87, and where a plaintiff was discharged so that the defendant corporation could

avoid paying a higher stock buy-back price for shares of its securities, *see Gallagher v.*

*Lambert*, 549 N.E.2d 136, 136–138 (N.Y. 1989).  "As an at-will employee, Plaintiff also cannot

contend that [his] termination constitutes a breach of contract."  *Campeggi v. Arche Inc.*, No. 15-

CV-1097, 2016 WL 4939539, at \*7 (S.D.N.Y. Sept. 14, 2016).  Accordingly, Plaintiff's eleventh

cause of action for breach of the implied covenant of good faith and fair dealing for his alleged

termination based on his religious beliefs is dismissed.

### 12. Unjust Enrichment

Finally, Defendants argue Plaintiff's twelfth cause of action for unjust enrichment should

be dismissed.  (Defs.' Mem. 23.)  Plaintiff does not specifically allege how Balchem was

unjustly enriched, but construing Plaintiff's claim liberally, the Court presumes Plaintiff is

alleging Defendants were unjustly enriched by receiving the benefit of Plaintiff's scientific

discoveries.

As with Plaintiff's claims alleging an implied covenant of good faith and fair dealing, the

existence of a valid contract renders unjust enrichment unavailable as a remedy.  *See Clark–*

*Fitzpatrick, Inc. v. Long Island R.R. Co.*, 516 N.E.2d 190, 193 (N.Y. 1987) ("The existence of a

valid and enforceable written contract governing a particular subject matter ordinarily precludes

recovery in quasi contract for events arising out of the same subject matter."); *see also Beth*

*Israel Med. Ctr. v. Horizon Blue Cross & Blue Shield of N.J., Inc.*, 448 F.3d 573, 587 (2d Cir. 2006) (noting that an unjust enrichment claim cannot be pled in the alternative when there is a "valid and enforceable contract governing [the] subject matter"); *RCA Trademark Mgmt. S.A.S. v. VOXX Int'l Corp.*, No. 14-CV-6294, 2015 WL 5008762, at *5–6 (S.D.N.Y. Aug. 24, 2015) (dismissing unfair competition claim as duplicative of breach of contract claim because "[i]t is well-settled . . . that no claim for unfair competition lies where its underlying allegations are merely a restatement, albeit in slightly different language, of the implied contractual obligations asserted in the cause of action for breach of contract" (alteration and internal quotation marks omitted)); *Cereus Prod. Dev., Inc. v. Boom LLC*, No. 14-CV-4292, 2015 WL 3540827, at *8 (S.D.N.Y. June 5, 2015) ("[I]t is one of the well-settled principles of New York law that the existence of a valid and enforceable contract governing a particular subject matter ordinarily precludes recovery in quasi contract for events arising out of the same subject matter." (internal quotation marks omitted)).[31]   A plaintiff may maintain tort claims in addition to

---

[31] Even if not duplicative, Plaintiff's claim would nonetheless be dismissed. "To prevail on an unjust enrichment claim, a plaintiff must prove that the defendant received a benefit at the plaintiff's expense and that retention of that benefit would be unjust." *Levion v. Societe Generale*, 822 F. Supp. 2d 390, 405 (S.D.N.Y. 2011), *aff'd*, 503 F. App'x 62 (2d Cir. 2012). "However, the law is clear that a plaintiff may not allege that his former employer was 'unjustly' enriched at his expense when the employer compensated the plaintiff by paying him a salary." *Id.*  "Rather, a plaintiff must allege that he performed work that exceeded the scope of his duties in his position and, therefore, his salary did not constitute reasonable value for the services he provided to his employer." *Lamb v. Money Transfer Sys., Inc.*, No. 12-CV-6584, 2013 WL 5216442, at *12 (W.D.N.Y. Sept. 16, 2013) (alteration and internal quotation marks omitted). Here, Plaintiff has not indicated that the services he provided exceeded the scope of his duties at Balchem.  Indeed, he repeatedly alleges he performed the exact duties he was hired to do.  Thus, Plaintiff's claim would also fail on the merits. *See Hughes v. Standard Chartered Bank, PLC*, No. 09-CV-4595, 2010 WL 1644949, at *7–8 (S.D.N.Y. Apr. 14, 2010) (granting employer's motion to dismiss claim for bonus where the plaintiff alleged the employer "was and continues to be enriched by the services that he performed," because "[t]he amended complaint does not allege that [the plaintiff] rendered any services to [the] defendants that were beyond the scope of his duties").

a breach of contract claim only where "a legal duty independent of the contract itself has been violated." *Bayerische Landesbank v. Aladdin Capital Mgmt. LLC*, 692 F.3d 42, 58 (2d Cir. 2012). Because Plaintiff's unjust enrichment claim is duplicative of the breach of contract claim, Plaintiff's twelfth cause of action is dismissed.

### III.  Conclusion

The Court dismisses Plaintiff's first and second cause of action under Title VII against the Individual Defendants only, the third cause of action for wrongful termination against all Defendants, the sixth cause of action for negligence against all Defendants, seventh cause of action for fraudulent concealment against all Defendants, the eighth cause of action for First Amendment violations against all Defendants, ninth cause of action for breach of fiduciary duty against all Defendants, and the tenth cause of action for defamation against all Defendants *with prejudice* because "[t]he problem with [his] causes of action is substantive; better pleading will not cure it." *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000); *see also Kamdem-Ouaffo v. Pepsico, Inc.*, 160 F. Supp. 3d 553, 574 & n.28 (S.D.N.Y.) (dismissing with prejudice a pro se complaint because better pleading would not cure the substantive deficiencies), *aff'd*, 657 F. App'x 949 (Fed. Cir. 2016); *Lastra v. Barnes & Noble Bookstore*, No. 11–CV–2173, 2012 WL 12876, at *9 (S.D.N.Y. Jan. 3, 2012) (dismissing with prejudice a pro se complaint that was "not simply 'inadequately or inartfully pleaded,' but rather contain[ed] substantive problems such that an amended pleading would be futile"), *aff'd*, 523 F. App'x 32 (2d Cir. 2013).

Plaintiff's fourth cause of action for breach of contract, fifth cause of action for intentional infliction of emotional distress, eleventh cause of action for breach of the implied covenant of good faith and fair dealing, and twelfth cause of action for unjust enrichment are dismissed against all Defendants *without prejudice*, because this is the first adjudication of

Plaintiff's claims on the merits. If Plaintiff wishes to file a second amended complaint, Plaintiff must do so within 30 days of the date of this Opinion. Plaintiff should include within that amended complaint any changes to correct the deficiencies identified in this Opinion that Plaintiff wishes the Court to consider. Plaintiff is advised that the amended complaint will replace, not supplement, the original complaint. The amended complaint must contain all of the claims and factual allegations Plaintiff wishes the Court to consider, and comply with Rule 8 of the Federal Rules of Civil Procedure and the Court's instructions in Section II.B.1. If Plaintiff fails to abide by the 30-day deadline, his claims may be dismissed with prejudice.

The Clerk of Court is respectfully directed to terminate the pending Motion, (Dkt. No. 28), and mail a copy of this Opinion and Order to Plaintiff.

SO ORDERED.

Dated:     September __14__, 2018
        White Plains, New York

KENNETH M. KARAS
UNITED STATES DISTRICT JUDGE

54